### In re UNO BROADCASTING CORPORATION, Debtor.

### Bankruptcy No. 94–02012–PHX–CGC.

United States Bankruptcy Court, D. Arizona.

May 11, 1994.

190

Ronald Jay Cohen and Scott L. Long, Phoenix, AZ, for Stanley D. Friedman, as receiver for Uno Broadcasting Corp.

Mark A. Nadeau and Steven J. Brown, Phoenix, AZ, for Greyhound Financial Corp.

Paul A. Conant, Phoenix, AZ, for Robert J. Tezak.

Alan A. Meda, Phoenix, AZ, for Uno Broadcasting Corp.

**ORDER RE: (1) MOTION TO DISMISS FOR LACK OF CORPORATE AUTHORITY; (2) MOTION TO ABSTAIN PURSUANT TO 11 U.S.C. § 305; (3) MOTION TO EXCUSE COMPLIANCE WITH 11 U.S.C. § 543**

CHARLES G. CASE, II, Bankruptcy Judge.

### I. INTRODUCTION.

Greyhound Financial Corporation ("Greyhound") has filed three motions, each aimed, to a greater or lesser degree, at the right of the Debtor, Uno Broadcasting Corporation ("Debtor"), to maintain this bankruptcy case. The motions are

1. A Motion to Dismiss for Lack of Corporate Authority and for Bad Faith Filing (the "Authority Motion");

2. A Motion to Dismiss and Abstain Pursuant to 11 U.S.C. § 305 (the "Abstention Motion"); and

3. A Motion to Excuse Turnover of Property under 11 U.S.C. § 543 (the "Turnover Motion").

The Debtor has opposed the Motions. The Court has held several hearings, taken evidence, and heard argument. The parties have submitted extensive briefs. For the reasons stated below, the Authority Motion is denied, the Abstention Motion is denied, and the Turnover Motion is granted.

### II. THE AUTHORITY MOTION.

A. Introduction.

The basis for the Authority Motion is that, pursuant to a Pledge Agreement executed in March, 1989, Robert Tezak ("Tezak"), the Debtor's sole shareholder, granted to Grey-

hound an irrevocable proxy to exercise, upon default and acceleration of the debt, all voting powers pertaining to his stock. Greyhound claims that, pursuant to this proxy, it, and only it, had the authority to authorize the filing of this Chapter 11 Petition or, for that matter, to take any other corporate action. The Debtor asserts that the proxy is invalid pursuant to its own terms and under applicable state law, so that actions taken by the Debtor to institute the case are valid.

The key facts are not in dispute. Greyhound extended a $2,400,000 term loan and a $1,400,000 revolving line of credit to the Debtor, evidenced by a Loan Agreement[1] dated March 28, 1989, and accompanying Loan Documents. Among the Loan Documents was the Personal Guaranty of Tezak, a Stock Pledge Agreement which secured Tezak's guaranty, and a Negative Covenant Agreement executed by Nancy Tezak, Tezak's wife, pursuant to a power of attorney from Tezak.

The Stock Pledge Agreement contains a number of provisions dealing specifically with the question of voting rights during the pendency of the pledge. These include:

1. Paragraph 5, "**Voting Power**":
 Unless and until a Event of Default and an acceleration of [Debtor's] Obligations and/or [Tezak's] Obligations pursuant to the terms of Subsection 8.2 of the Loan Agreement shall have occurred, [Tezak] shall be entitled to exercise all voting powers in all corporate matters pertaining to the collateral for any purposes not inconsistent with, or in violation of the provisions of any of the "Loan Instruments . . . ."

2. Paragraph 6.2.2, "**Default and Remedies**":
 If an Event of Default shall occur and be continuing, and if [Debtor's] Obligations and/or [Tezak's] Obligations shall have been accelerated pursuant to the terms of Subsection 8.2 of the Loan Agreement, [Greyhound], at its option, may: . . . 6.2.2. Exercise all voting powers pertaining to the Collateral and otherwise act with respect thereto as though

[Greyhound] were the owner thereof. . . .

3. The final unnumbered paragraph under Paragraph 6, "**Default and Remedies**"
 With respect to the actions described in each of Subsections 6.2.2 and 6.2.4 above, [Tezak] hereby irrevocably constitutes and appoints [Greyhound] its [sic] proxy and attorney-in-fact with full power of substitution and acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable.

4. Paragraph 6.10
 Notwithstanding any of the provisions of this Pledge Agreement to the contrary, the control over the capital stock of the [Debtor] pledged by [Tezak] to [Greyhound] pursuant to the terms of the Pledge Agreement, and the exercise of all voting rights relating thereto, shall remain with Pledgor, until any required consent of the FCC to the transfer of such control to [Greyhound] or its nominees, successors or assigns shall have been obtained.

5. Paragraph 9.7 which provides as follows:
 **THIS PLEDGE AGREEMENT SHALL BE GOVERNED BY THE LAWS AND DECISIONS OF THE STATE OF ARIZONA.**

The Debtor is an Illinois corporation. Section 8 of its Bylaws contains the following provision:

(c) An appointment of a proxy is revocable by the shareholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest in the shares of the corporation generally.

Soon after Greyhound funded the loan, trouble began. After several years of negotiations regarding restructuring the obligation, Greyhound commenced litigation in District Court for the District of Arizona against the Debtor and Tezak. On December 6, 1993, a

---

**1.** Capitalized terms refer to terms defined in the Loan Agreement.

Judgment in the amount of $3,249,029.60 was entered against the Debtor and Tezak. During the course of that litigation, the Debtor had disputed the existence of a default and had sought relief by counter-claim against Greyhound for, among other things, violation of the covenant of good faith and fair dealing. Because those issues were indisputably resolved by the District Court in its judgment, there can be no doubt that the loan was in default and the balance accelerated, thereby triggering the effect, if any, of the "voting rights" provisions in the Pledge Agreement.

In the early stages of the litigation, Greyhound sought the appointment of a receiver to take possession of and operate the four pairs of radio stations owned by the Debtor. After various hearings, this request was denied without prejudice by the District Court. Following entry of judgment, the Debtor sought a stay pending appeal; the District Court set the amount of the supersedeas bond at $4.4 million. When the bond was not posted, the District Court appointed Stanley Friedman [2] on December 22, 1993, as Receiver of all of the assets of the Debtor. Under the order, the Receiver was authorized to, and did, apply to the Federal Communications Commission ("FCC") for transfer of the broadcast licenses [3] to his name. Prior to filing of this case, the licenses were transferred to the Receiver.

On September 7, 1992, Tezak had granted to his wife, Nancy Tezak, a General Power of Attorney authorizing her, among other things, "to vote stock in person or by proxy." Acting pursuant to this Power of Attorney, Nancy Tezak called a "Special Meeting of Shareholders" of the Debtor on February 22, 1994, and voted all of the shares of the corporation in favor of the filing of a petition pursuant to Chapter 11 of the Bankruptcy Code. The Debtor filed this case thereafter, on March 4, 1994.

From the record presented, it appears uncontested that, prior to March 4, 1994, Greyhound did not exercise any voting rights with

regard to the stock, in connection with the filing of a Chapter 11 or for any other purpose. It is also uncontested that Greyhound has not applied to the FCC for consent to the transfer of the stock to it and that the stock has not been transferred to the Receiver.

The narrow issue presented by the Authority Motion is whether Tezak had the right to empower Nancy Tezak to vote Debtor's stock to authorize the bankruptcy filing. If he did, the Motion should be denied. If he did not, the Motion should be granted.

Relying upon Paragraph 6.2.2, Greyhound asserts that the steps taken by Nancy Tezak to initiate the bankruptcy were ineffective. The cases cited by Greyhound, *In re Consolidated Auto Recyclers, Inc.*, 123 B.R. 130 (Bankr.D.Me.1991) and *In re John Hicks Chrysler–Plymouth, Inc.*, 152 B.R. 503 (Bankr.E.D.Tenn.1992) support the critical two prongs of Greyhound's position that (1) a proxy to vote stock which is properly granted and is irrevocable and enforceable under state law will be upheld (2) where the pledge agreement specifically addresses an event of default and gives the creditor the right to vote the stock in such event.

### B. *Was FCC Consent Required?*

The Debtor agrees with Greyhound's statement of the law, but asserts that the facts of this case do not fit within that law. As a first defense, the Debtor argues that the Pledge Agreement specifically provides that no voting control shall be transferred until such time as any required approval of the transfer of the stock by the Federal Communications Commission has been obtained. If FCC approval of the stock transfer is required, the provisions of Paragraph 6.10 effectively gut the provisions of Paragraph 6.2.2, by conditioning the lender's voting power on that approval. This sort of uncertainty is unavoidably involved in broadcast lending. All parties agree, for example, that a creditor may not take a security interest in broadcast licenses. Thus, a creditor

---

**2.** Mr. Friedman is a partner of the national accounting firm of Coopers & Lybrand.

**3.** The Debtor operated four pairs of radio stations involving eight licenses. The stations are

KBLU–AM and KTTI–FM in Yuma, Arizona, KTOP–AM and KDVV–FM in Topeka, Kansas, KOLE–AM and KKMY–FM in Port Arthur, Texas and WJOL–AM and WLLI–FM in Joliet, Illinois.

may have enforceable liens upon all of the hard assets of a broadcasting entity, but no lien on its essential intangible, the FCC license. The provisions relating to the consent of the FCC to transfer stock likewise create unavoidable risks.

■ The precise words of the contractual restriction are critical to the analysis. Paragraph 6.10 provides that "notwithstanding any of the provision of this Pledge Agreement to the contrary, the *control over the capital stock ... and the exercise of all voting rights relating thereto*, shall remain with [Tezak], until any *required* consent of the FCC to the transfer of *such control* [relating to the control over the capital stock] to [Greyhound] has been obtained." The key word in the sentence is "required." The effect of the language in question is triggered *only if* FCC approval of the transfer of the voting power of the stock is required by federal statute or FCC rule.

The Debtor argues that 47 U.S.C. § 310(d) requires approval of any stock transfer.[4] That statute, however, deals with transfers of *licenses* and appears to provide only that the requirement of FCC approval of a new licensee cannot be bypassed by a change of control of stock. Here, the license has already been transferred and no further transfer is sought.

■ Greyhound argues that Paragraph 6.10 has been satisfied by the transfer of the FCC broadcast licenses to the Receiver, which all parties agree has been effected, and that, given such transfer, no FCC approval of the transfer of voting power is required. In support of its position, Greyhound has submitted a brief and a declaration of experienced FCC counsel stating that no such FCC

consent is required under applicable statutes or rules.

The Court adopts Greyhound's view and concludes that paragraph 6.10 is not a bar to the validity of the proxy. The FCC's interest in the internal affairs of the Debtor is confined to control over who holds its broadcast licenses. Once the licenses were transferred to the Receiver[5], that interest ceased. There appear to be no Federal statutes, FCC rules, or cases that require the consent of the FCC for a *former* licensee to transfer control of its capital stock or its voting power. The demands of the public interest are the prime considerations for the FCC in granting, renewing, and modifying broadcast licenses. Communications Act of 1934, 47 U.S.C. §§ 303, 307 and 309; *Brandywine–Main Line Radio, Inc. v. F.C.C.*, 473 F.2d 16, 48 (D.C.Cir.1972) *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). That public interest has been satisfied by the consent of the FCC to the transfer of the licenses to the Receiver.

### C. *Did the Proxy Expire?*

■ The Debtor's next argument is that the proxy expired in accordance with applicable state law in 1990 and was not regranted or renewed.[6] Such law makes clear that a proxy, whether revocable or irrevocable, is effective for a maximum of eleven (11) months, *unless otherwise provided in the proxy*. Such a provision has been enforced in similar circumstances. *See Auto West, Inc. v. Baggs*, 678 P.2d 286, 289 (Utah 1984) (proxy expired pursuant to state law where, on its face, proxy indefinite in duration). While the precise language granting the proxy contains no specific extension of the proxy's term, Paragraph 8 of the Pledge Agreement makes all terms of that agree-

---

**4.** This is the only argument made by Debtor on this issue. Although specifically directed by the Court to do so, Debtor did not submit a supplemental brief or a declaration in support of its position.

**5.** The District Court order establishing the receivership authorized the Receiver to apply for the transfer of the licenses to him. Although the Debtor has raised issues concerning the District Court's authority to assist in the transfer of property which is indisputably not Greyhound's collateral, the fact is that the FCC accepted the

application and effected the transfer. Any argument that the Debtor has with the Receivership order should be addressed either to the District Court or to the Court of Appeals in a properly perfected appeal.

**6.** Both Arizona and Illinois law, as well as the Debtor's By–Laws, have provisions that limit a proxy's effectiveness to eleven months. See A.R.S. § 10–033(C); Il.St. Ch. 805 § 5/7.50; By-laws § 8(b).

ment effective for so long as the debt remains unpaid.[7] Since the proxy is an essential term of the Pledge Agreement, the Court concludes that Paragraph 8 satisfies this requirement of applicable law.

### D. Did the Power of Attorney Violate the Negative Pledge?

Greyhound next asserts that the receipt by Nancy Tezak of the Power of Attorney was a violation of the Negative Covenant Agreement entered into by her in connection with the loan transaction and therefore its attempted exercise is ineffective. In that document, Nancy Tezak agreed that she would not "accept or make claim to or for any conveyance, gift, assignment or other transfer of all or any part of [the Debtor's] assets." The transfer involved here was the power to vote stock owned by Tezak, not stock owned by the Debtor. The stock represents Tezak's own equity interest in the Debtor and is not itself an asset of the Debtor. Therefore, there has been no violation of the Negative Covenant Agreement.[8]

### E. Did the Irrevocability Language Need to be "Conspicuous"?

Finally, the Debtor argues that the proxy is revocable[9] because the provision relating to irrevocability is not "conspicuous" as required by Illinois law. Il.St. Ch. 805 § 5/7.50.[10] To reap the benefit of this provision, however, the Debtor must overcome

7. As the Court stated from the bench during oral argument, the Court is of the view that the Rule Against Perpetuities does not invalidate this agreement.

8. Greyhound's also points to the Negative Pledge as one of many indications of the Tezaks' and the Debtor's bad faith. Greyhound argues that the Tezaks and the Debtor, with the constant direction of able counsel, have carefully charted a course that may fit the precise words of the various loan documents but clearly evades their spirit. While there is some appeal to Greyhound's argument, the fact is that this was a highly negotiated loan transaction among sophisticated parties on all sides. Under those circumstances, it is appropriate for the parties to live with the precise terms of the deal they struck, to the extent those terms are valid and enforceable.

9. If the proxy is revocable, then the acts taken by Nancy Tezak pursuant to the power of attorney from Robert Tezak, even though in derogation of the proxy, would be effective. *In re John Hicks*

Paragraph 9.7 of the Pledge Agreement which provides that the "laws and decisions of the State of Arizona" govern the Pledge Agreement since there is no corresponding "conspicuousness" requirement under Arizona corporate law.[11]

In the absence of the choice of law provision in Paragraph 9.7, there is no doubt that the law of the State of Illinois would govern the effectiveness of the proxy. It is well established that the law of the state of incorporation should determine issues relating to a corporation's internal affairs. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983); *Rogers v. Guaranty Trust Co. of New York*, 288 U.S. 123, 130, 53 S.Ct. 295, 297, 77 L.Ed. 652 (1933); *Restatement (Second) of Conflicts of Laws*, § 302 (1971). In *Guaranty Trust*, the Supreme Court of the United States stated

It has long been settled doctrine that a court—state or federal—sitting in one state will, as a general rule, decline to interfere with, or control by injunction or otherwise, the management of the internal affairs of a corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile. . . .

288 U.S. at 130, 53 S.Ct. at 297 (citations omitted). *This rule makes complete sense.*

*Chrysler–Plymouth, Inc.*, 152 B.R. 503 (Bankr. E.D.Tenn.1992).

10. Greyhound complains that this issue arose *after* a preliminary ruling of the Court which limited further argument and briefing to the issue of whether FCC consent to the transfer of voting power was required. Given the expedited manner in which this motion was brought on and heard, and given that both parties were afforded an additional opportunity to brief this issue, the Court finds that this objection is not well taken.

11. Greyhound makes no serious argument that the irrevocability provisions of the proxy are "conspicuous." Ironically, it is the choice of law paragraph that demonstrates that the parties knew how to make a provision conspicuous if they wanted to: it is set out in **BOLD, ALL CAPITALIZED LETTERS.**

A corporation is a fictional entity created under the laws of a particular state. In the absence of the laws governing the creation, rights and duties of a corporation, the corporation would not exist. Therefore, the manner in which the corporation transacts its internal affairs is peculiarly within the interests of the state of incorporation.

 On this point, Greyhound asserts that the irrevocability of a proxy is not an "internal affair" of the Debtor. Rather, it is Greyhound's view that this is a matter between Debtor and creditor, since the proxy is a necessary adjunct to the enforcement of its economic interests as pledgee of the stock. Thus, the proxy does not change, in Greyhound's view, fundamental corporate internal affairs such as methods of voting, the organization of the Board of Directors, protection of minority shareholders, issuance of dividends, and the like. In Greyhound's view, all of those matters would remain the same; the only issue is who the party exercising those rights would be.

This argument is unconvincing. Control over a corporation is very much one of its internal affairs. If the proxy is irrevocable, then the holder of that proxy, Greyhound, can control every aspect of the corporation's business, including the election of its board of directors, amendment of bylaws, amendment of its charter, and modification of its capital structure. Illinois law, consistent with certain other states, provides for conspicuousness as to irrevocability precisely because of the overwhelming impact that an irrevocable proxy can have upon the internal governance of a corporation.

This case, however, is not so simple. Here, the parties explicitly chose to have the pledge agreement, of which the proxy is part, controlled by "the law and decisions of the state of Arizona." What impact does that choice have upon the otherwise strong policy of applying the "internal affairs doctrine"?

 The answer can be found by looking at Arizona law itself. Unlike some states, Arizona specifically disavows any effort to control the internal affairs of foreign corporations which are doing business within its borders. Two provisions of Arizona law are critical on this point. The first is A.R.S. § 10–033(c), which provides as follows:

> A shareholder may vote either in person or by proxy executed in writing by the shareholder or by his duly authorized attorney-in-fact ... a duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.

Thus, in Arizona, there is specific law dealing with the manner in which a "shareholder" may execute an irrevocable proxy in favor of a third party, and that law does not require that the irrevocability be stated in a conspicuous way. However, this provision only governs proxies given by "shareholders." Under A.R.S. § 10–002(16), a shareholder means one who is the holder of a record of shares in a corporation and, pursuant to A.R.S. § 10–002(8), "corporation" means "a corporation for profit subject to the provisions of this chapter, *except a foreign corporation.*" (Emphasis added). By definition, therefore, the irrevocable proxy provisions of Section 10–003 do not apply to a shareholder of a foreign corporation, such as Mr. Tezak in his capacity as sole shareholder of the Debtor.

 This implicit indication that Arizona corporate law does not purport to affect rights of shareholders in foreign corporations is made explicit in A.R.S. § 10–106(A). This second critical statute deals with the right of a foreign corporation to transact business in Arizona, providing explicitly:

> A foreign corporation shall not be denied authority by reason of the fact that the laws under which such corporation is organized governing its organization and internal affairs differ from the laws of this state, and *nothing in this chapter [which includes A.R.S. § 10–033] shall be construed to authorize this state to regulate the organization or the internal affairs of such corporation.*

[Emphasis added]. So, even if Arizona law were applied, the result would be that the irrevocability of the proxy would be determined pursuant to Illinois law, not Arizona law.

Greyhound argues that the choice of law provision in Section 9.7 should relate only to the "local law" and not include the "choice of law" provisions of Arizona law, citing Section 187(3) of the *Restatement (Second) of Conflicts of Laws*. This issue need not be determined because, even if Greyhound is correct, the "local law" as embodied in the sections from the corporate code cited above would dictate that Illinois law governs. Boiled to its essence, A.R.S. § 10–106 is a codification of the internal affairs doctrine and, as such, makes the choice of law provision of Paragraph 9.7 irrelevant.

Greyhound argues that the requirement of "conspicuousness" under Illinois law is a "mere formality." To the contrary, the fact that the Illinois legislature sought to include the conspicuousness requirement *only* in the case of irrevocability indicates that, from the standpoint of the public policy of Illinois, it is a matter of substance and importance. The court in *In re John Hicks Chrysler–Plymouth, Inc.*, 152 B.R. 503 (Bankr.E.D.Tenn.1992) invalidated a proxy virtually identical to the one at issue here precisely for the same reason—lack of conspicuousness.

Therefore, because the Authority Motion depends in its entirety upon the irrevocability of the proxy, and the proxy is not irrevocable under applicable Illinois law, the Authority Motion is denied.

## III. THE ABSTENTION MOTION.

Greyhound's second Motion asks this Court to abstain from hearing this case under the authority of 11 U.S.C. § 305(a)(1), which provides

The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—(1) the interests of creditors and *the debtor* would be better served by such dismissal or suspension. . . .

(emphasis supplied).

Citing the extensive proceedings already held and presently underway before the District Court, Greyhound and the Receiver argue that this case is appropriate for abstention.[12] The District Court has held numerous hearings, entered summary judgment in favor of Greyhound as against both the Debtor and Tezak, entered a post-judgment receivership Order appointing Mr. Friedman as Receiver, and retained jurisdiction over the receivership—in particular, the supervision over and approval of the sale of certain of the radio stations and the approval of the fees and expenses of the Receiver. In Greyhound's view, the interests of all relevant parties are fully protected by the pending receivership case and the maintenance of the bankruptcy would be onerous, expensive, duplicative and unnecessary. The Court disagrees. .

Section 305(a)(1) requires the Court to consider not only the interests of a particular creditor, but the interests of *all creditors* and the Debtor. Because of this conjunctive requirement, Section 305 cases typically arise in the context of involuntary cases since, almost by definition, a debtor in a voluntary Chapter 11 case is pursuing a reorganization goal that may be inconsistent with the parochial interests of a particular creditor. In, for example, *In re Central Mortgage & Trust, Inc.*, 50 B.R. 1010 (S.D.Tex.1985), the debtor was the subject of a liquidation proceeding brought by the state banking department. The state sought abstention, arguing that the interests of the debtor and creditors were protected and better served in the state liquidation proceedings. The District Court disagreed, stating,

In the instant action, which involves a debtor seeking to reorganize under Chapter 11 in contradistinction to the banking commissioner who was seeking to liquidate CMT, the *Starbuck* rationale is not persuasive. The interests of the debtor in attempting a reorganization outweighs any competing considerations of efficiency and economy that may exist.

50 B.R. at 1021. In the cited case, *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135

---

12. Although the Motion is styled as one seeking "abstention," the Court understands Greyhound's request to be dismissal of the case. *See,*

*e.g., In re G–N Partner,* 48 B.R. 459 (Bankr. D.Minn.1985).

(Bankr.S.D.N.Y.1981), the Securities and Exchange Commission commenced an equity receivership of an entity subject to its jurisdiction. The beneficiaries of that receivership were all claimants against Starbuck. The Bankruptcy Court found that the receivership was providing efficient and equitable distribution of the debtor's assets, so that the best interests of creditors was served by continued administration of the receivership, outside bankruptcy.

In the present case, the pending District Court receivership was brought by and for the benefit of Greyhound. No distribution or priority scheme exists for the protection of unsecured creditors and equity security holders. The purpose of the receivership is to liquidate the assets of the debtor to pay the judgment obtained by Greyhound. Except tangentially, the interests of other creditors and, certainly, of the Debtor and its equity security holders are not implicated and the receivership Order provides no protection for those interests at all. As the Court noted in *In re Property Management & Investments, Inc.*, 17 B.R. 728 (Bankr.M.D.Fla.1982),

> [T]he entire State Court Receivership was designed to be and is nothing but a total and absolute liquidation of the assets of an insolvent debtor. It is further evident that the distribution of the proceeds of a liquidation are not done, and will not be done if the matter remains in the State Court in accordance with the scheme of distribution provided by the Bankruptcy Code either in the context of a liquidation plan under Chapter 11 or in the context of Section 726 if the case is converted into a Chapter 7 liquidation case.

17 B.R. at 730.

In support of their position, Greyhound and the Receiver rely heavily on two cases, *In re Sun World Broadcasters, Inc.*, 5 B.R. 719 (Bankr.M.D.Fla.1980) and *In re O'Neill Village Personal Care Corporation*, 88 B.R. 76 (Bankr.W.D.Penn.1988). Neither is persuasive in this context.

*Sun World*, as is typical, was an involuntary case. It was filed by a disgruntled creditor, dissatisfied with proposed distributions in a state court liquidation which was ready to be concluded when the petition was filed. After the creditor had a full opportunity to present its claim in the state court, it received an adverse result. The creditor then filed an involuntary petition seeking redress from the Bankruptcy Court. The present facts are entirely different. No evidence has been presented that this Debtor is seeking to subvert or overturn the District Court Judgment through manipulation of this Court. Rather, given the reality of the District Court Judgment, the Debtor is seeking to reorganize its affairs, through a partial liquidation or otherwise, for the purpose of paying all of its creditors and retaining some value for the equity security holders. In *Sun World*, there were fifty-six non-dissenting creditors who were in a position to be paid in full at the time of the bankruptcy filing. Under those circumstances, the Bankruptcy Court saw no reason to increase the expense, burden, and costs of administration for those creditors whose claims had already been administered and adjudicated by allowing the bankruptcy proceeding to continue. In this case, moreover, nothing has happened in the District Court except the entry of a judgment in the favor of Greyhound and the appointment of a receiver. No other claims have been adjudicated and no mechanism exists for such adjudication or for the protection of the rights of equity security holders. Therefore, *Sun World* is inapposite.

The Receiver relies heavily upon *O'Neill*, citing in particular the "unsavory" character of the principals of the Debtor.[13] In *O'Neill*, a state court receiver was in control of the debtor's assets. The receiver had discovered many irregularities and had taken a number of actions to remedy them. In short, the receiver was well-versed in the company, had invested substantial time, and was protecting the interests of all parties.

It was this last point that largely drove the Bankruptcy Court's decision to abstain. The Court concluded that, if the bankruptcy were

---

**13.** In this case, Tezak has pled guilty to and is awaiting sentencing on a felony unrelated to Uno Broadcasting.

to continue, a trustee would be appointed and the state court receiver would not be eligible to serve as such a trustee under those circumstances. The court found that "this is as clear a case of duplicative effort as this Court can imagine." 88 B.R. at 80. Such is not the case here. As indicated below, this Court will grant the Motion to Excuse Compliance with Turnover under Section 543, which means that the receiver will remain in custody and control of the Debtor's assets during the course of the bankruptcy, pending further order of the Court. As such, the money expended to date by the Debtor for the costs of the receivership will not be wasted and a duplication of those expenses will not be necessary. Further, the Receiver's experience and expertise with regard to the issues of this case will not be lost, but will be available to the estate.

As the *O'Neill* court said, "The key issue in determining the propriety of a Section 305 dismissal is whether it will serve the best interests of both the debtor and the creditors." In this case, the Court is unconvinced that the interests of parties other than Greyhound would be better served by the maintenance of this action as a District Court receivership. This is particularly true since any decision by this Court to abstain or not to abstain is specifically nonreviewable by appeal or otherwise pursuant to 11 U.S.C. § 305(c). Therefore, as the *O'Neill* court noted, the relief requested is appropriate only in "an egregious situation." Given the remedies available under Section 543, the Court finds that this situation is not egregious, so that abstention pursuant to 11 U.S.C. § 305(a)(1) is not appropriate. Therefore, the Abstention Motion is denied.

## IV. *THE TURNOVER MOTION.*

 Finally, Greyhound seeks an order excusing compliance with the turnover requirements of 11 U.S.C. § 543(a), in accordance with 11 U.S.C. § 543(d). Generally, a custodian in possession, including a receiver, is required to deliver all assets within his custody and control to the trustee or the debtor-in-possession, following commencement of the case. 11 U.S.C. § 543(a); *Ohio v. Kovacs*, 469 U.S. 274 at 285 n. 12, 105 S.Ct.

705 at 711 n. 12, 83 L.Ed.2d 649 (1985). The receiver may be excused from turnover if the Court determines, in exercise of its discretion that, "the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody or control of such property...." 11 U.S.C. §§ 305, 543(d)(1). The exception to turnover is a modified abstention provision. *See* Comment to 11 U.S.C. § 543; *Constable Plaza Associates*, 125 B.R. 98, 103 (Bankr.S.D.N.Y. 1991).

Section 543(d) cases are fact intensive, turning upon whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor. *See, e.g., In re Dill*, 163 B.R. 221 (E.D.N.Y. 1994). Courts consider factors including whether there will be sufficient income to fund a successful reorganization and whether there has been mismanagement by the debtor. *Id.* at 225, citing *Constable Plaza*, 125 B.R. at 103–04.

 In this case, it is not difficult to conclude that the assets of the Debtor should remain in the hands of the Receiver. The evidence suggests that the Receiver has been proceeding expeditiously and professionally to manage the affairs of the Debtor. The Receiver has begun to deal with seriously delinquent obligations to the Internal Revenue Service, has reorganized management, has implemented accounting controls, has contacted and dealt with numerous vendors and has taken certain personnel actions. The Receiver has experience in the broadcast industry, although by his own admission, is "not an expert" at broadcast station management. Nonetheless, this Court is satisfied, as was the District Court, that the Receiver is proceeding appropriately and expeditiously in handling the affairs of the estate.

The Debtor offers no serious alternative. Mr. Tezak, sole shareholder of the Debtor and the person previously in charge of the operations of the Debtor, is unable to manage the business at this time, as he is in prison. His wife, Mrs. Tezak, to whom he has given a Power of Attorney, admittedly has no experience in the broadcast industry and no substantial general business experi-

ence. She proposes to engage Mr. Stephen Clarke, an experienced management consultant, but the scope of his proposed duties are not well-defined. Mr. Clarke would not assume the position of Chief Executive or Chief Operating Officer of the Debtor; rather, he would "advise" and "consult with" Mrs. Tezak as the need arises. This informal arrangement is insufficient to provide a suitable management team for the Debtor for the protection of the interests of creditors.

The interests of creditors would similarly be disserved by costs necessarily incurred in displacing Mr. Friedman. Unlike the typical situation, in which a custodian would return assets to preexisting management, the custodian here would be required to turnover the assets to yet another third party. There would undoubtedly be substantial disruption, duplication, costs, and confusion arising out of another management change at this point. The Debtor did not propose that Mr. Clarke replace Mr. Friedman; even if this, more specific, arrangement were proposed, the Court would have been disinclined to remove Mr. Friedman. While Mr. Clarke is experienced and capable, the Debtor did not persuade the Court that the attendant costs would serve the interests of creditors.

Although Greyhound presented substantial evidence of mismanagement during the District Court proceedings, the receiver was actually appointed as a way of protecting Greyhound's collateral pending appeal. Nevertheless, both in that proceeding and the proceeding before the Bankruptcy Court, sufficient evidence of mismanagement was presented to justify the retention of the receiver. *See, e.g., In re WPAS, Inc.*, 6 B.R. 40 (Bankr. M.D.Fla.1980); *In re Dill*, 163 B.R. 221. Therefore, the Turnover Motion will be granted and the Receiver shall stay in place with the powers and duties enumerated in the District Court Order as may be modified herein or by further Order of this Court.

### V. *DUTIES OF THE RECEIVER; ROLE CLARIFICATION.*

■ There is no direct guidance in the Code on the powers, duties and status of an "excused custodian." For example, as noted by the Court in *In re Posadas Associates*, 127 B.R. 278 (D.N.Mex.1991), "the Code does not specifically state how the custodian's fees and expenses are to be treated when excused from compliance with turnover." 127 B.R. at 280–281. In this Court's view, the receiver, as a custodian excused from compliance with turnover in a bankruptcy case, now must have obligations and responsibilities to *all* creditors of the estate and, assuming solvency, to the equity security holders of the estate. The Receiver is now the functional equivalent of a trustee, although having not been appointed as such. Once turnover is excused, it defies logic to treat the Debtor as the "debtor-in-possession," since the receiver is in possession. Another option is to treat the receiver as an examiner with expanded powers and to set out the terms and conditions of those powers under a separate order.

■ The exact status of the receiver, except as already established herein, will be left to another day. In the interim, the Receiver must comply with Section 327(a) for the employment of all professional persons. Therefore, the Receiver is directed to file application for the employment of his counsel, his accountant, and any other consultants he has retained. Each of the professionals whose employment is sought is directed to comply with Section 327(a) and Rules 2014 and 2016. From the date of this Order, all fees and expenses of the Receiver, as well as the fees and expenses of professionals engaged by him, are subject to application, notice and a hearing, review, and approval by this Court. Fees and expenses of the Receiver, prior to the date of this order, may, at the option of the Receiver, be approved by the District Court in accordance with the existing Receivership Order or by this Court pursuant to 11 U.S.C. § 543(c)(2).

■ The Receiver shall, in addition, provide regular management reports to the Debtor no less than monthly. The Debtor shall have access to the corporate books and records, except that access shall be restricted to ordinary business hours and shall not be disruptive to the Receiver or the business.

The Court wishes to clarify and stabilize the position of the Receiver as soon as possible. Therefore, the Debtor, Greyhound, the

202

Receiver, and the U.S. Trustee are directed to meet and confer within ten days of this order to determine whether an overall agreement on the scope and nature of the Receiver's authority can be reached. If so, the parties shall so notify the Court and submit a stipulated form of order. If not, the parties are directed to file, within ten days of the meeting, such Motions as each may deem appropriate with regard to the status of the Receiver and the implications for this case of the Receiver's being excused from turnover.[14] The Court will review such motions when filed and will determine how best to schedule them for disposition.

**SO ORDERED.**

---

14. Such motions could include a motion to appoint the Receiver as Trustee, to appoint the Receiver as examiner with expanded powers, a motion to leave the Receiver in place pursuant to the existing District Court Order, or any similar motions. In addition, the Court will entertain on an expedited basis, a motion to terminate exclusivity so that any interested party, including, without limitation, the Debtor, the Receiver, Greyhound, or any committee, may file a Plan of Reorganization and accompanying Disclosure Statement.