**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CHURCHILL SECURITIES, INC., Defendant.**

**In re CHURCHILL MORTGAGE INVESTMENT CORP., et al.,**

**Nos. 93 CIV. 7486(CBM), 93 CIV. 5298(CBM) to 93 CIV. 5312(CBM).**

United States District Court, S.D. New York.

June 30, 1998.

Richard H. Walker, SEC Regional Administrator, New York City, for Plaintiff.

Gerard A. Riso, Stein, Riso, Haspel & Jacobs, New York City, for Defendant.

*Opinion on Motion for Withdrawal of Reference to the Bankruptcy Court*

MOTLEY, District Judge.

This case presents the question of whether this court should withdraw the reference to the bankruptcy court of the fee application of a federal receiver appointed at the Securities and Exchange Commission's request. The court denies the instant motion to withdraw the reference and, therefore, does not address the objections raised by the Chapter 7 Bankruptcy Trustee, the Creditors' Committee, and the United States Trustee to the form, reasonableness, or category of the request, i.e., whether the receiver's entire fee must be treated as an administrative bankruptcy expense and compensated in full and related questions, all of which are left to the Bankruptcy Court, without prejudice to the timely renewal of the instant motion.

## A. Chronology of Events

On November 1, 1993, the Securities and Exchange Commission (the "SEC") filed a complaint against Churchill Securities, Inc. ("CSI"), Churchill Mortgage Investment Corp. ("CMIC"), and Gerald P. Hirsh ("Hirsh"), alleging violations of the federal securities laws. On April 17, 1996, this court, by consent, issued a final judgment of permanent injunction and other equitable relief (the "1996 Injunction") against the three defendants which enjoined them from further securities law violations.

In violation of the 1996 injunction, the three defendants continued to sell unregistered securities and to make material misrepresentations about them. Therefore, the SEC sought the appointment of a Receiver. By order dated March 25, 1997 (the "Receivership Order"), Judge Thomas P. Griesa, another judge of this court, froze the assets of a number of entities owned and/or controlled by Hirsh (the "Hirsh Entities") and appointed Howard E. Heiss as Receiver for the Hirsh Entities, including CMIC. The Receivership Order instructed the Receiver to "take and retain immediate possession, custody and control" of all assets of CMIC and/or the Hirsh Entities and to take "all steps he deems necessary to secure and protect the assets and property of CMIC and/or the Hirsh Entities." ¶ V(1),(2). The Receiver was to undertake a detailed accounting of the Hirsh Entities and make reports regarding same. Consequently, reports were filed by the Receiver on April 24, 1997 (the "First Report"), on June 16, 1997 (the "Second Report"), and on June 20, 1997 (the "Supplemental Report"). The Receivership Order provided that Hirsh and CMIC were to the pay the costs, fees, and expenses of the receivership and that applications for such costs were to be made by application to this court.

On or about March 12, 1997, two investor lawsuits were commenced in the New York State courts against the Hirsh Entities. On or about April 14, 1997, two other investor lawsuits were similarly commenced. The Receiver, believing that the actions were brought so that the plaintiffs in the state court actions could gain a priority over other investors in the eventual distribution of the estate, and seeking to the prevent the piecemeal dismemberment of the receivership estate, sought an injunction staying these proceedings. The injunction was granted by this court on April 24, 1997.

Before this court granted the injunction, an involuntary Chapter 7 petition was filed against CMIC on April 17, 1998. The Receiver learned of the filing on April 18, 1998. Thus, along with the motion for a temporary injunction staying the private lawsuits against the Hirsh Entities, the Receiver sought a modification of the Receivership Order extending his authority to include participation "as responsible party or debtor-in-possession" in bankruptcy cases brought by or against the Hirsh Entities. This court granted authority to the Receiver to place the Hirsh Entities in bankruptcy, if appropriate, by order dated April 28, 1997. On June 23, June 27, and July 2, the Receiver filed bankruptcy petitions on behalf of the 14 remaining Hirsh Entities.

## B. The Receiver's Fee Applications

On July 8, 1997, the Receiver submitted a declaration and fee application (which incorporated an earlier interim fee application) for the payment of fees and expenses incurred in the administration of the receivership estate through June 30, 1997. The interim fee application of May 27, 1997 sought $284,073.20 for the Receiver, Morrison & Foerster (his law firm), and KPMG Peat Marwick (his accounting firm). The fee application of July 8 sought $611,436.48 for services for the Receiver, the law firm, and the accounting firm during the period of May 1 through July 1, 1997. The Receiver also sought $7,500 for preparing a matrix of creditors, bringing the total sought by the Receiver to $903,009.68. Since the Debtors, as of June 30, 1997, had only $364,000, the Debtors would be required to liquidate assets over time to the pay the Receiver.

All of the fee applications were initially submitted to this court. However, by Notice of Motion dated July 17, 1997 (filed in Bankruptcy Court, then transferred to this court), the Receiver moved to withdraw the reference of his fee application to the Bankruptcy Court. The question now before this court for decision is whether the motion to withdraw the reference to the Bankruptcy Court should be granted or denied.

According to the Receiver, the Receiver's reports complied with the detailed accounting the court ordered in that they identified, inventoried, and secured the books, records, and assets of the Hirsh Entities. They also included, according to the Receiver, a detailed analysis of the assets and liabilities of the Hirsh Entities. The Receiver claims that the Hirsh Entities did not maintain their corporate separateness, a fact which made it "virtually impossible" to distinguish among the assets, liabilities, income, expenses and other financial details of the individual Hirsh Entities.

The Receiver contends that his work produced a number of benefits. For example, the Receiver allegedly insured that no further investments were sold through the Hirsh Entities, coordinated with law enforcement agencies regarding Hirsh's activities, established an investor information service, imposed some semblance of order on the operations of the Hirsh Entities, and wrote Reports to the Court which have provided and will provide clear, useful information to the investors and others. The Receiver further contends that he began the process of preparing for a smooth transition of the estate to the Bankruptcy Trustee, offered assistance to the Trustee, and turned over control of the assets, real property, books, and records of the Hirsh Entities to the Bankruptcy Trustee.

The Trustee argues that the Receiver's application for approval of his fees and expenses should be denied. She contends that the Receiver's pre-petition work lacked sufficient detail and that the Receiver's post-petition work was not limited to the winding up of services, especially insofar as the Receiver allegedly made post-petition disbursements.

▮▮▮ The standards governing the Receiver's reimbursement are those applicable to bankruptcy custodians. *See* 11 U.S.C. § 101(11)(A) ("Custodian means—[a] receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title."). The commencement of a bankruptcy proceeding supersedes the custodianship. *See* 11 U.S.C.A. § 503(b)(3)(E); *In re 245 Associates, LLC*, 188 B.R. 743, 747–748 (Bankr.S.D.N.Y.1995) (explaining that

"the commencement of the case supersedes the custodianship" and that "the filing of a petition—whether involuntary or voluntary—commences a case under the Bankruptcy Code"). Thus, once the Receiver became aware of the petition, he could not "make any disbursement or take any action, except to the do what is necessary to the preserve the property" that is in bankruptcy. *In re 245 Associates, LLC,* 188 B.R. at 747–748 (Bankr. S.D.N.Y.1995). The parties agree that compensation of a superseded custodian for his pre- and post-petition activities is governed by two provisions of the Bankruptcy Code, namely § 503(b) and § 543.

Section 503(b) provides, in relevant part, that pre-petition administrative claims are allowable for:

(3) The actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian;

(4) Reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services ... and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

Section 543, entitled "Turnover of property by a custodian", governs the custodian's post-petition activities. This section provides, in relevant part, that:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian ... that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor....

(c) The court, after notice and a hearing, shall—

(2) provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian....

The parties disagree over a number of issues regarding the Receiver's work, particularly: (1) whether it was possible for the Receiver to account for which work was done for the entities in bankruptcy and which work was done for entities not in bankruptcy; (2) whether the Receiver has accounted for his work in sufficient detail; (3) the extent and nature of the Receiver's post-petition work, i.e., whether the Receiver's post-petition work was limited to actions necessary to preserve the assets of the estate, to turnover the property of the estate, and account for such property; and (4) whether the Receiver's work benefitted the estate and whether it even needs to have benefitted the estate.

The parties do not dispute that the Receiver "acquire[d] knowledge of the commencement" of the involuntary bankruptcy proceeding involving CMIC on April 18, 1997. According to the Trustee, "since the Receiver concedes that there is no basis for distinguishing between work done for CMIC and work done for the other Hirsh entities, only the work performed before April 18, 1997... should be considered pre-petition. All work performed on and after that date must be considered post-petition." Mem., 15. The Receiver, of course, believes he is entitled to his full fee because "the Receiver's duties to compile the reports that the Court ordered him to complete were unaffected by the bankruptcy filing.... [d]ue to the interrelatedness of the Hirsh entities, the Receiver could not have completed his reports and could not have given the Court an accurate picture of the money owed investors without also examining CMIC's books and records." Reply Mem., 22.

## C. The Withdrawal of the Reference is Denied at this Time for the Following Reasons

█ Title 28, U.S.C. § 157(d) provides, in relevant part, that "the district court may withdraw, in whole or in part, any case or proceeding referred in this section ... for cause shown." Since "cause" is not a defined term in the statute, the Second Circuit has held that, in deciding whether to withdraw an issue from the bankruptcy court, "the district court should weigh several factors, of which the first is the most important: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors." *In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir.1996) *citing In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993).

### 1. Core or non-core

The Receiver does not dispute that a fee application such as the one before the court is a core matter, as it pertains directly to the administration of the debtor creditor relationship. *See* 28 U.S.C. §§ 157(b)(2)(A),(O). Although core matters may be and have been withdrawn in this Circuit, the fact that this factor is the most important suggests that the other factors must, taken together, weigh heavily in favor of the Receiver in order for his claim to prevail. *See In re Burger Boys, Inc.*, 94 F.3d 755 at 762 (although "the decision to the grant or deny the motion for an extension of time is plainly a core bankruptcy matter ... we find no error in the decision to withdraw the reference from the bankruptcy court"); *In re Orion Pictures Corp.*, 4 F.3d at 1101 ("A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn.")

█ The determination of the fee application will have a direct and substantial impact on the entire bankruptcy proceeding. The Receiver's $900,000 expenditure reflects the work of myriad professionals who have created extensive documentation pertaining to the classic bankruptcy issues: what funds exist (or did exist) and where they are located. The expertise of the bankruptcy judge will enable him to determine whether this $900,000 fee is reasonable compensation for the services rendered in this matter, especially the contentious issue of the services rendered by the accountants. Moreover, the bankruptcy judge has the responsibility as well as the ability to ensure that administrative expenses, such as superseded receivers' fees, are properly and timely paid. This quintessentially core issue is presumptively one for the bankruptcy judge alone, in the first instance.

### 2. What is the most efficient use of judicial resources?

This consideration also militates against a withdrawal. Although this court has familiarity with the earlier, related issues involving the Churchill and Hirsh entities, the relatively short periods of time involved as to a Receivership lasting only a few months assures that judicial resources would not be wasted if the bankruptcy judge heard these issues involving the Receiver's fees and expenses. *See Shawmut Bank Connecticut v. Lawrence*, 209 B.R. 588, 590 (N.D.N.Y.1997) ("In contrast [to *In Re David Fischer,*], the present action was filed in December of 1996, and far fewer judicial resources have been brought to bear. Moreover, the briefing and other legal services rendered thus far should prove useful to the parties in any future Bankruptcy Court proceedings concerning this matter. Thus, the court finds that withdrawing the plaintiff's motion... would not advance the interest of judicial economy.") (*citing In re Fischer*, 202 B.R. 341 (E.D.N.Y. 1996)). Of course, there was the 1993 action as well as the 1996 action before this court, but, as noted above, the issues there were separate. The issues in the instant motion were the subject of an extremely short-lived receivership

### 3. What is the delay and what are the costs to the parties?

Because the parties' interests are opposed (money to the Receiver is money away from

the creditors), one party's cost is the other party's benefit. A withdrawal would result in some delay while the court decided the issue; on the other hand, it is unclear how much overall delay could be caused given that the fees and expenses must be determined at some point. Insofar as cost is related to prejudice, there is some prejudice suffered by the Receiver if there is not a withdrawal because the Receiver had explicit expectations that the court would deal with his fee.

### 4. What will promote uniformity of bankruptcy administration?

This prong, it seems, folds into the prong about core and non-core because if something is a core bankruptcy matter—i.e., something that the bankruptcy courts were created to the address, as opposed to a counterclaim—then the uniformity of administration would always suffer by that matter's adjudication in an Article III rather than a bankruptcy court.

### 5. Forum Shopping

The Receiver has clearly expressed his preference to have his fee heard before this court, but forum shopping does not appear to be his primary motivation.

### 6. Other factors

This appears to be a case of first impression.[1] This is because most bankruptcy cases are fact specific. Although the other factors seem to militate against a withdrawal, there are a number of factors in this category which militate in its favor. First, as the SEC pointed out in the hearing on the Receiver's motion, not allowing a withdrawal could provide a disincentive for federal receivers because of the fear that they might not recoup their investments of time and work. In other words, it is in the interest of the investing public that SEC Receivers should not be faced with the uncertainty of having to litigate their fee applications in a different forum.

One could also argue that investors would themselves lose their incentives to invest because of the fear that if they were forced into a creditor relationship, a receiver might access the money ahead of—and maybe instead of—them, but this is a more attenuated argument. Finally, the Receiver had expectations that the court would hear his fee application, although, arguably, he had a responsibility to inform the court that his activities should wind down or seek specific court approval either here or in the Bankruptcy Court for continuation of his activity after bankruptcy proceedings seemed imminent.

### CONCLUSION

Although there are some reasons which favor a withdrawal of the reference, an overall balancing of the *Burger Boys* factors in this indisputably core matter compels the conclusion that the reference should not be withdrawn at this time. In light of the short time periods involved, efficiency considerations support this conclusion. The court is not required to explicitly address equity issues, but it notes that the Receiver is protected by the same statutes that it seeks this court to apply. As a custodian, the Receiver is entitled to his proper fees and reimbursement; as a superseded custodian, the Receiver must in this case apply for that reimbursement from the bankruptcy judge first.

---

1. The parties refer to cases in other circuits which are somewhat on point, but none is directly on point: in one of the cases, the parties had stipulated to the court's deciding a fee application; in another case, the court held that the Receiver was not subject to the requirements of a superseded custodian. *See In re San Vicente Medical Partners, Ltd.*, 962 F.2d 1402, 1404 (9th Cir.1992); *In re Uno Broadcasting Corp.*, 167 B.R. 189, 201 (Bankr.D.Ariz.1994).