**In re SI YEON PARK, LTD., Debtor.**

**STATE STREET BANK AND TRUST COMPANY, Plaintiff**

v.

**Yeon Ha PARK and Si Yeon Park, et al., Defendants.**

**Bankruptcy No. LA96–14298–LF.
Adv. No. AD96–01825–LF.**

United States Bankruptcy Court,
C.D. California.

July 23, 1996.

Richard M. Moneymaker, Los Angeles, CA, for Debtor.

Michael S. Kogan, Los Angeles, CA, Chapter 11 Trustee

Richard Golubow, Winthrop Couchot, Newport Beach, CA, for Chapter 11 Trustee–Michael Kogan.

Leslie A. Cohen, Robinson, Diamant, Brill & Klausner, Los Angeles, CA, for Jong Joon Corporation.

Nancy Knupfer, Los Angeles, CA, for Chapter 7 Trustee of Jong Joon Corp.

Charles Lee Courier, Lei Lei Wang–Ekvall, Albert, Weiland & Golden, Costa Mesa, CA, for State Street/Amresco.

Steven K. Linkon, Linkon & Associates, Santa Ana, CA, for State Court Receiver Young S. Hong.

## AMENDED OPINION RE CONTINUATION OF STATE COURT CONTEMPT PROCEEDINGS

LISA HILL FENNING, Bankruptcy Judge.

This single asset real estate Chapter 11 case and two related bankruptcies have developed into a procedurally convoluted war. The original dispute has been resolved: the borrower has fully paid off the mortgage that had been in default, and the receiver has been relieved of his assignment. The issues now before this Court involve two adversary proceedings consisting of claims and counterclaims arising out of the parties' actions *during* the litigation.

Of immediate concern are contempt proceedings set for hearing in state court next week. By order of this Court, the parties have been enjoined from participating in any further proceedings in state court. Nevertheless, the state court has ordered them to appear and proceed with the contempt motion that had been filed and then attempted to be withdrawn by the former receiver. The state court judge previously refused to allow the withdrawal on the grounds that once a contempt motion is filed, it becomes a matter between the judge and the alleged contemnor, and cannot be withdrawn or settled without court approval. The parties have been warned by the state court judge that any failure to appear may itself be punishable by contempt.

Enjoined by the bankruptcy court from proceeding, but in danger of a state court contempt citation for a failure to proceed, the counsel for the former receiver filed an emergency motion seeking a "writ of instruction" from this Court which essentially asks for any help that might relieve the former receiver and other parties of this dilemma. All parties agree that no further proceedings should go forward in the state court, but like the Sorcerer's Apprentice, they cannot figure out how to stop what they have set in motion by their heedless escalation of the litigation.

This Court has already held that a bankruptcy trustee cannot be held in contempt in a state court proceeding for filing an adversary action in bankruptcy court without asking the state court for permission to sue its receiver. This Court also held that, following the removal of the state court receivership action to bankruptcy court, no case is pending in state court. The bankruptcy court now has jurisdiction over the receivership action. Despite being fully informed of these rulings, the state court judge insists that the contempt matter must proceed to hearing. The parties have been enjoined from proceeding in the state court forum; the only possible remaining step that could be taken to stop that hearing would be to enjoin the state court itself. However, such a step would be contrary to basic principles of federalism and would be impossible to enforce. Therefore, this Court declines to take any further action, choosing instead to rely on the state court to recognize federal jurisdiction in this matter.

## BACKGROUND

The legal battles began with the filing of a judicial foreclosure action by State Street Bank in March 1995. That action resulted in the appointment of a receiver, Young S. Hong, for a commercial building occupied by a family-operated Korean restaurant. The

building itself was owned by principal of the restaurant, Si Yeon Park ("Mrs. Park"), through a partnership, Si Yeon Park, Ltd. Mrs. Park was also the principal of Jong Joon Corp., which owned and operated the restaurant and held the liquor license. After more than nine contentious months of legal battles and unsuccessful negotiations during the receivership, three Chapter 11 cases were filed in succession in late 1995 and early 1996 by the real property partnership, the restaurant corporation, and Mrs. Park individually, in an attempt to prevent the eviction of the restaurant for nonpayment of rent and the completion of the foreclosure. *In re Jong Joon Corp.*, LA95–38656–LF (filed 11/3/95; converted to Chapter 7 on 2/5/96); *In re Si Yeon Park and Yeon Ha Park*, LA95–40535–LF (filed 11/22/95; dismissed 2/15/96); and *In re Si Yeon Park, Ltd.*, LA96–14298–LF (filed 2/9/96; Chapter 11 trustee appointed 2/26/96).

When Jong Joon Corp., the restaurant operating entity, filed its Chapter 11 petition, it was a holdover tenant on a lease that had terminated pre-petition. As debtor in possession, it entered into a stipulation with the receiver for continued occupancy of the premises, in exchange for payment of administrative rent and a transfer of the liquor license to the receiver upon any default. Although discussed at a hearing on December 7, 1995, this stipulation was never filed with nor finally approved by the Court. Jong Joon defaulted almost immediately, and the case was converted to Chapter 7 at a hearing on January 17, 1996. Debtor thereafter was ordered to surrender the restaurant premises effective February 1, 1996, but the Court specifically deleted the provision for transfer of the liquor license that had been included in the proposed order.

In quick succession, the Parks filed *Si Yeon Park, Ltd.*, the real property case, on February 9 and dismissed their individual Chapter 11 case on February 15. Despite the new filing by the owner of the real property, on February 15, the receiver entered into a new one-year lease of the restaurant premises with a third party, Ke Hoon Chung. In late February, the Bank obtained relief from stay to proceed with foreclosure in *Si Yeon Park, Ltd.* primarily because of the serial nature of the filings and the debtors' contradictory declarations about who really owned what assets. Combined with apparent conflicts of interest among the debtors and other indicators of bad faith—such as the purported leasing of the premises to the Parks' son on January 29—these factors led to the appointment of a Chapter 11 trustee *sua sponte.*

Facing an imminent foreclosure sale due to the lifting of the stay in *Si Yeon Park, Ltd.*, Mrs. Park somehow obtained funds sufficient to pay the Bank's $740,000–plus claim in full on March 27, 1996, reserving all rights against the Bank, receiver, and their agents. The Bank notified the receiver of the payment, releasing the property for turnover to the debtor. The receiver's operating duties ended, except for the filing of a final report and account which was set for hearing in June. It is undisputed that, at that point, full control of the real estate was returned to the Chapter 11 trustee. Although it had been subject to the control of the receiver because of the lifting of the automatic stay, the real estate had remained the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a), pending the completion of the judicial foreclosure.

Ordinarily, full payment of the Bank's claim would end this story. However, the intervening lease means that Mrs. Park cannot reopen the restaurant, even though the partnership has now recovered the real property. Moreover, the receiver did not merely give Mr. Chung possession of the premises: he also transferred the liquor license and all personal property of the restaurant. These transfers occurred despite the limited nature of the relief from stay order and the express deletion of the requested provision regarding the transfer of the liquor license. Neither the surrender order, nor the relief from stay order, authorized the receiver to seize personal property belonging to the *Jong Joon* estate (*i.e.*, the restaurant furniture, liquor license, accounts, etc.). Nor did any bankruptcy court order authorize the sale of any *Jong Joon* assets by either the receiver or the bankruptcy trustee. Nevertheless, debtor Jong Joon has offered evidence that Mr.

Chung has appropriated the use of the restaurant's name, merchant credit card authorization numbers, and other intangible assets.

Exactly why the Parks would want to resume operation of the restaurant has never been clear. As far as the record before this Court shows, the restaurant had failed to generate sufficient revenues to cover the mortgage payment for quite a long time before its eviction. On the other hand, Mrs. Park has apparently regarded the new lessee's appropriation of her own name for his commercial use as a personal affront, which may explain some of the intensity of this litigation battle.

The *Jong Joon* estate was effectively left with no assets to administer and the *Si Yeon Park, Ltd.* estate was left with real property encumbered by a short term lease with a third party who was not willing to vacate the premises. The result was the joint filing of adversary complaints in both of the pending bankruptcy cases by the *Jong Joon* Chapter 7 trustee, the *Si Yeon Park, Ltd.* Chapter 11 trustee, and Jong Joon Corporation. *Vasquez, et al. v. Young Hong and Ke Hoon Chung (In re Jong Joon Corp.)*, Adv.Proc. No. 96–0170–LF; *Vasquez, et al. v. Young Hong and Ke Hoon Chung (In re Si Yeon Park, Ltd.)*, Adv.Proc. No. 96–01706–LF (filed April 15, 1996). The named defendants were the former receiver and the new tenant. The multi-count complaint sought invalidation of the lease as violative of the automatic stay, turnover of the premises, injunctive relief, compensatory damages, and punitive damages of $500,000. Plaintiffs immediately filed an emergency motion for instant turnover of the premises and a temporary restraining order, which was set for hearing on April 18, 1996 at 10:00 a.m.

The former receiver countered by filing the motion for contempt in the state court case and serving notice of an emergency hearing for 8:30 a.m. on April 18, 1996, just hours before the bankruptcy court hearing on the motion for turnover. The two bankruptcy trustees, their attorneys, and attorneys for Jong Joon Corporation were the named respondents. The motion contended that the filing of the adversary complaint violated a state law that requires any party wishing to sue a state-court-appointed receiver to obtain permission from the appointing court. Cal.Civ.Proc.Code § 568. No direct violation of a court order was alleged. The state court issued an order to show cause re contempt, set for hearing on May 7, 1996.

At the TRO/turnover hearing in bankruptcy court, the parties presented the state court OSC re contempt. The Court denied the request for a TRO and turnover, based upon a finding that no emergency existed, and insufficient justification had been demonstrated for mandatory injunctive relief that would drastically change the parties' circumstances before adjudication of the underlying issues. The lessee did agree to cease any references to the restaurant as the Si Yeon *Family* Restaurant, since the Si Yeon family was not involved in its operation, and to cease any usage of the debtors' merchant credit card account numbers.

The former receiver then sought to withdraw his contempt motion in light of the debtors' payment of the Bank and turnover of the property to the debtor. The state court refused to allow the withdrawal. On May 6, 1996 on the eve of the contempt hearing in state court, the trustees filed a notice of removal of the state court case to the bankruptcy court pursuant to 28 U.S.C. §§ 1442, 1446, and 1452. On June 3, 1996, a full hearing on the contempt motion was held in the removed case before this Court. This Court concluded that, as a matter of law, the filing of the adversary proceedings did not constitute contempt of court. Findings of fact, conclusions of law, and an order setting forth the basis for that holding were entered on June 18. At the parties' request—to clarify that all state court activity was to stop—the order specifically enjoined them from participating in any further proceedings in state court.

All parties expected that presentation of that order to the state court would end the matter. That expectation proved wrong. On June 19, 1996, the receiver appeared in state court at the previously scheduled hearing on the receiver's final report and account. Based upon the removal, the receiver requested that all pending matters be taken off

calendar. The receiver also informed the state court of the bankruptcy court's order on the contempt matter. Nevertheless, the state court judge ordered the receiver, the trustees, and their attorneys to appear on June 21 to proceed with the contempt hearing against respondents.

After business hours on June 19, the receiver's attorney faxed to chambers the Ex Parte Application for a Writ of Instruction that is presently before this Court. Explaining the latest action by the state court, the application asks this Court to tell the parties how they can avoid being held in contempt by either the state court or the bankruptcy court as a result of these contradictory orders: the bankruptcy order saying that they are forbidden to proceed; the state court ordering them to go forward. Because of the pendency of this Application, the state court hearing has been continued until July 12.

## DISCUSSION

Only three alternatives appear to be available at this impasse:

1. This Court could retract its injunction barring further proceedings by the parties in the contempt matter. This action would relieve the parties of the risk that they would be found in contempt for violating this Court's injunction, but might result in conflicting orders on the contempt motion itself.

2. This Court could decline to act. Such a decision would leave the parties at risk of contempt no matter which way they proceed. Given the questionable tactics used by all parties in their game of litigation hardball, that outcome might be poetic justice, but it would likely exacerbate the overall litigation problem.

3. An injunction could be issued directly enjoining the state court itself from further proceedings. The parties would be relieved of the threat of additional contradictory orders. Enforcement of such an injunction would be highly problematic, however.

If the contempt matter then goes forward in the state court, either the state court judge will agree with or defer to the ruling on the matter already made by this Court, or he will issue an order that contradicts the bankruptcy court order in some manner. The first result would merely be duplicative. The second alternative would necessarily interfere with the exercise of federal bankruptcy jurisdiction, since this Court has already ruled that bankruptcy trustees cannot be required to obtain permission from a state court to file a bankruptcy adversary proceeding.

As explained in the findings and conclusions entered on June 18, giving state courts veto power over federal actions by federally appointed bankruptcy trustees would violate federal supremacy and interfere with the administration of bankruptcy cases. Moreover, the bankruptcy court has exclusive jurisdiction to determine whether a case or adversary proceeding has been improperly filed in the bankruptcy court. The exercise of that jurisdiction is particularly important when the matter involves fundamental questions of bankruptcy law, like the enforcement of the automatic stay. *See MSR Exploration, Ltd. vs. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir.1996).

## I. Under Federal Law, the Bankruptcy Court Decides Turnover and Automatic Stay Issues Involving Pending Receiverships, not the State Court.

### A. The Issues in the Trustees' Adversary Complaints

At the heart of the adversary complaints filed by the trustees is a dispute about what exactly the receiver was allowed to do with whose property, in light of the bankruptcy court orders regarding the eviction and foreclosure. However difficult or easy that question might ordinarily be, here it was muddled by the confusion created by the debtors over the ownership of the various real and personal property assets, as well as the timing of their various litigation manuevers. The receiver asserts that, under the terms of the bankruptcy court orders, he was allowed to transfer Jong Joon's personal property and business to a third party. The trustees and Jong Joon argue that the automatic stay continued to protect Jong Joon's personal property from seizure for the bene-

fit of creditors, and that the receiver's actions violated that stay. Interpreting the scope and effect of bankruptcy court orders modifying the automatic stay in a pending bankruptcy case raises primarily issues of federal law, not state law.

### B. Which Court Should Decide Whether the Complaints Were Properly Filed

■ Who wins the lawsuits by the trustees against the receiver on the merits is not ripe for determination. Ever since the complaints were filed, the fight has been about which court should determine whether they were properly filed.

Both sides have engaged in blatant forum shopping. The debtors filed the three bankruptcy cases at least partly in an effort to oust the state courts of jurisdiction. In a "tit-for-tat" response, the receiver sought "home court" advantage by filing the contempt motion in the state court that appointed him, rather than filing motions to dismiss the complaints in the bankruptcy court where the cases were filed—which would have been the usual response to an improperly filed complaint.

The receiver's contempt motion alleged only a single ground for a contempt finding: that the bankruptcy trustees and their lawyers filed the turnover complaints in bankruptcy court without first obtaining the permission of the state court that appointed receiver. The motion asked the state court to issue an order that:

1. The bankruptcy trustees and other respondents be found in contempt;

2. The bankruptcy trustees dismiss their adversary complaints that were filed in the bankruptcy court against the former receiver;

3. The bankruptcy trustees "remove" their emergency motions from the bankruptcy court calendar;

4. The respondents "refrain from interfering in any manner with the Receiv-

er's exercise of his duties and obligations as Receiver";

5. The respondents refrain from filing any litigation against the Receiver.

Granting the contempt motion would mean that the adversaries seeking turnover of property of the bankruptcy estate and sanctions for alleged violations of the automatic stay would have to be dismissed and could not be refiled by the bankruptcy trustees unless the state court gave them permission to do so. The remedies sought would directly affect the bankruptcy court dockets and calendars, as well as the overall administration of these cases.

If bankruptcy trustees have to beg permission to sue state court receivers in order to recover possession and control of bankruptcy estate property from a receivership pending at the time of the bankruptcy petition, in effect the state courts would have the final say as to the disposition of bankruptcy estate property and causes of action. The interference with bankruptcy jurisdiction that would result would be clearcut and serious.

Bankruptcy cases are often filed to address problems that are already the subject of pending state court receivership proceedings. Conflicting jurisdiction between bankruptcy court and the writs and receivers department of the state court over a specific *res* is thus commonplace, not rare. The Bankruptcy Code specifies what is supposed to happen under those circumstances: federal law and jurisdiction prevails.

■ The automatic stay is supposed to prevent the state court proceedings from going forward, unless the *bankruptcy court* decides that it should be lifted or modified. 11 U.S.C. § 362(a), (d). Any order or other action by a state court in violation of the automatic stay is void. *In re Schwartz*, 954 F.2d 569 (9th Cir.1992). It is up to the *bankruptcy court* to decide, in its discretion, whether the receiver should be excused from turning over the assets of the bankruptcy estate, under standards of federal law as set forth in § 543.[1] Such determinations are

---

1. Section 543 provides as follows:
 **11 U.S.C. § 543. Turnover of property by a custodian.**

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement

fact-intensive. Unless excused by the bankruptcy court, receivers are required to deliver any property of the bankruptcy estate to the trustee. 11 U.S.C. § 543(b). The bankruptcy court, rather than the court that appointed the receiver, must make that evaluation. The decision requires consideration of the interests of all classes of creditors of the bankruptcy estate, not just the interests of the creditor who initiated the receivership. *See, e.g., In re Uno Broadcasting Corp.,* 167 B.R. 189, 201 (Bankr.D.Ariz.1994) (Case, B.J.) (excusing a district court receiver holding corporate stock from turnover, but denying abstention request); *In re Northgate Terrace Apartments, Ltd.,* 117 B.R. 328 (Bankr.S.D.Ohio 1990) (Sellers, B.J.) (ordering receiver to turnover apartment complex to debtor in possession). It is also the *bankruptcy court* that is authorized by § 543(c) and (d) to determine the reasonableness of expenses of the custodian and determine appropriate protection for third parties who dealt with the custodian, unless that court elects to defer to the custodian's home court. *In re Uno Broadcasting, supra,* 167 B.R. at 201.

Section 543's approach to turnover issues is consistent with the Bankruptcy Code's fundamental premise: that the bankruptcy court overseeing the entire bankruptcy proceeding is in the best position to evaluate all of the equitable factors required for fair adjustment of claims and interests. As the Ninth Circuit recently observed,

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 et seq., demonstrates Congress's intent to create a whole system under federal law which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.

*MSR Exploration, Ltd. v. Meridian Oil Co.,* 74 F.3d 910, 914 (9th Cir.1996) (holding that bankruptcy court had exclusive jurisdiction regarding debtor's claims against a creditor for misconduct during a bankruptcy case; separate malicious prosecution suit could not be filed in state court or federal district court).

The receiver ignored the Bankruptcy Code, however, basing his contempt motion entirely on California cases interpreting Cal. Civ.Proc.Code § 568. That section provides:

from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.
(b) A custodian shall—
 (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
 (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.
(c) The court, after notice and a hearing, shall—
 (1) protect all entities to which a custodian has become obligated with respect to such property or proceeds, product, offspring, rents, or profits of such property;
 (2) provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian; and
 (3) surcharge such custodian, ... for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved, after notice and a hearing, by a court of competent jurisdiction before the commencement of the case under this title.
(d) After notice and hearing, the bankruptcy court—
 (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors ... would be better served by permitting a custodian to continue in possession, custody, or control of such property....

§ 568. **Powers of Receivers.** The receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the court may authorize. This statute has been interpreted as giving courts of equity the power to determine whether to permit their receivers to be sued, or whether property legally in the receiver's possession should be seized or sold. *See, e.g., Petaluma Sav. Bank v. Superior Court of San Francisco,* 111 Cal. 488, 44 P. 177 (1896); *Murray v. Etchepare,* 132 Cal. 286, 64 P. 282 (1901). These cases assume that the appointing court can usually prevent the proliferation of lawsuits by requiring a claimant to assert its claim in the receivership proceeding itself. *See, e.g., Vitug v. Griffin,* 262 Cal.Rptr. 588, 591, 214 Cal.App.3d 488, 493 (1989).

■■■■ It should be noted that a parallel requirement exists under bankruptcy law. Permission is required from the appointing bankruptcy court for filing lawsuits alleging negligence or intentional misconduct by a trustee in administering a bankruptcy case. *See, e.g., Barton v. Barbour,* 104 U.S. (14 Otto) 126, 136–37, 26 L.Ed. 672 (1881) (courts other than the appointing court lack jurisdiction to entertain suits against trustees, absent permission of that court); *In re Kashani,* 190 B.R. 875 (9th Cir. BAP 1995) (bankruptcy court can require debtor to make reasonable showing of prima facie case as prerequisite for granting a motion for permission to sue a trustee for negligence and malfeasance in administration of case). Thus, the receiver here was similarly required to come to the bankruptcy court for permission to seek contempt sanctions against the bankruptcy trustees.

The problem is that none of the cases relied upon by the receiver in seeking contempt citations involved bankruptcy court trustees as parties. The receiver's motion completely ignored federal supremacy and bankruptcy preemption. During the bankruptcy court hearing on the contempt motion, however, the receiver could no longer avoid the bankruptcy implications. His only response was an argument that 28 U.S.C. § 959(b) imposes a duty on bankruptcy trustees to comply with CCP § 568.

■■■ Section 959(b) does not impose any such procedural requirement on trustees. Rather, it obligates a federal trustee or receiver to "manage and operate the property in his possession according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). This section means that federal trustees and receivers, including bankruptcy trustees, have to comply with all applicable health and safety code, building code, business license requirements, environmental, and other regulatory obligations of business or property operations. *See, e.g., Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (holding trustee responsible for cleaning up toxic property); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 593–94 (9th Cir.1993) (holding that, because § 959 does not mandate payment of corporate registration arrears during Chapter 11, the state Department of Corporation's dissolution of a delinquent corporation was void; former debtor corporation therefore had standing to file antitrust action); *In re San Vicente Medical Partners Ltd.,* 962 F.2d 1402, 1408 n. 5 (9th Cir.1992) (federal district court receivership is chargeable for expenses of operating property in compliance with local laws, including state regulations regarding operation of nursing homes).

■■■ Prosecuting and defending claims against the estate does not constitute "engaging in business" within the meaning of § 959. *Austrian v. Williams,* 216 F.2d 278, 285 (2d Cir.1954); *In re Jacksen,* 105 B.R. 542, 545 (9th Cir. BAP 1989). *See also* 4 Collier on Bankruptcy ¶ 721.04[6] at 721–13 (15th Ed.1988). Moreover, § 959 is not an additional exception to the automatic stay of § 362. *Hillis Motors, supra,* 997 F.2d at 592–94. Suing a trustee who has failed to meet such obligations requires compliance

with all applicable provisions of the Bankruptcy Code.

Thus, CCP § 568 is not the kind of state law to which § 959(b) is intended to apply. It is not a law of general applicability governing the operation of businesses or property. Rather, it is a general provision defining powers and obligations of receivers. As such, it cannot supersede bankruptcy procedure and jurisdiction.

## II. Removal of a State Court Case to Federal District or Bankruptcy Court Terminates the State Court's Jurisdiction.

 Before the state court ruled on the receiver's contempt motion, the pending case was removed to the bankruptcy court. Removal is effective immediately upon the filing of a copy of the notice of removal with the clerk of the court from which the matter is removed. F.R.Bankr.P. 9027. As Rule 9027 provides, "[t]he parties shall proceed no further in that court unless and until the claim or cause of action is remanded." Upon the filing of the notice, the jurisdiction of the state court is terminated; no further proceedings are appropriate. *See generally, e.g., Lou v. Belzberg*, 834 F.2d 730, 740 (9th Cir.1987) ("a federal court may enjoin the continued prosecution of the same case in a state court after its removal").

The federal rules governing removal are straightforward on this point. Nevertheless, despite the removal of the receivership proceeding to the bankruptcy court, the state court insists that it has continuing jurisdiction over the contempt matter and can require the parties to continue with those proceedings. The basis for that assertion of jurisdiction is unclear, for none of the parties has advocated or briefed that position.

 The only ground cited for the contempt motion is the failure of the bankruptcy trustees to get state court permission before suit. The powers and duties of the trustees are defined by federal law, not state law. While the state court judge's desire to protect state court receivers from harassment suits is understandable, he no longer has the jurisdiction to decide any matters in the removed case, unless and until the case is remanded to the state court. The parties are barred by Rule 9027 and by this Court's order from proceeding further in the state court in connection with this matter. Moreover, this particular motion has already been decided in the bankruptcy court. If the suit has been filed without any proper basis, then this Court can and will sanction the plaintiffs appropriately under applicable federal standards. *See, e.g., In re Eighty South Lake*, 63 B.R. 501 (Bankr.C.D.Cal.1986), *aff'd*, 81 B.R. 580 (9th Cir. BAP 1987) (dismissing Chapter 11 case and awarding sanctions of nearly $19,000 against debtor for bad faith filing).

## III. Federal Courts' Power to Enjoin State Court Proceedings in Bankruptcy Matters.

### A. The Bankruptcy Exception to the Anti–Injunction Act.

 As a general rule, federal courts are exceedingly reluctant to enjoin state court proceedings. As the Supreme Court emphasized in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), this reluctance is in deference to the fundamental principles of federalism, which represents

> a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.... [T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state court is not to issue such injunctions.

*Id.*, 401 U.S. at 44–45, 91 S.Ct. at 750–51. This general prohibition on injunctions is embodied in the Anti–Injunction Act, 28 U.S.C. § 2283 (Act of June 25, 1948, c. 646, § 1, 62 Stat. 968), which provides:

> § 2283. **Stay of State court proceedings.**
>
> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid

of its jurisdiction, or to protect or effectuate its judgments.

■ The bankruptcy laws, however, are one of the well-recognized statutory exceptions. Injunction of state court proceedings are an everyday occurrence in bankruptcy filings. But the injunction is usually by statute, not generally by separate court order: it is known as the automatic stay. 11 U.S.C. § 362(a). The bankruptcy law exception was first expressly recognized by Congress in the Act of June 22, 1874, c. 390 (18 Stat. 178, 43rd Cong., 1st sess.), and has been embodied in the various iterations of bankruptcy laws since then. *Mitchum v. Foster,* 407 U.S. 225, 230–31, 92 S.Ct. 2151, 2157–58, 32 L.Ed.2d 705 (1972).

Indeed, in this case, the Bank properly came into bankruptcy court for relief from the automatic stay to permit proceedings to continue in state court. Such relief was granted to permit the receiver to obtain possession of the leased premises from debtor Jong Joon, and the Bank to proceed with the receivership proceedings against Si Yeon Park, Ltd.

In addition to the statutory automatic stay, courts have looked to § 105(a) of the Bankruptcy Code as the current statutory basis for authorization of issuance of court orders enjoining state court proceedings. Section 105(a) provides:

§ 105. **Power of court.**

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The legislative history of § 105 reveals Congress' intent that this section would constitute the necessary express authorization. In *In re Neuman,* 71 B.R. 567 (S.D.N.Y.1987), the bankruptcy court enjoined a debtor's state court lawsuit challenging his Chapter 11 trustee's right to operate a nursing home

under the debtor's certificate of necessity. Affirming, the district court concluded that:

> Section 105 of the Bankruptcy Code, however, is an "expressly authorized" exception to the [Anti–Injunction Act]. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5815; 2 Collier on Bankruptcy ¶ 105.02 (15th ed. Supp.1986). It authorizes the Bankruptcy Court to stay proceedings in state court, *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 316 (1977), and is "in no way circumscribed by possession or custody of a *res.*" 2 Collier on Bankruptcy ¶ 105.02 p. 105–3 (15th ed. Supp.1986). Rather, "The basic purpose of the section is to enable the court to do whatever is necessary to aid its jurisdiction, *i.e.,* anything arising in or relating to a bankruptcy case." *Id.*

*In re Neuman, supra* at 571. The district court held that the bankruptcy court, rather than the state court, should properly be the forum to determine the boundaries of its own jurisdiction, as well as the applicability of the automatic stay and the scope of property of the estate. *See also In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir.1986) (holding that bankruptcy court had power under § 105 to revoke Chapter 13 confirmation order upon discovery of debtor's bad faith).

Injunctions have been issued by bankruptcy courts against many types of state court proceedings. Among the common problems are criminal prosecutions that, among other relief, seek restitution for cheated creditors. Injunctions against such proceedings will be granted only if the bankruptcy court concludes that the criminal action is primarily a debt collection device designed to circumvent the bankruptcy discharge, rather than a public law enforcement effort. *Compare, e.g., In re First Texas Petroleum, Inc.,* 52 B.R. 322 (Bankr.N.D.Tex.1985) (McGuire, B.J.) (injunction against state criminal prosecution for securities fraud should not be granted because restitution was a secondary consideration; comprehensive catalog of cases both pro and con), with *In re Seidelman,* 57 B.R. 149 (Bankr.D.Md.1986) (Schneider, B.J.) (injunction against criminal proceedings initiated in bad faith by creditor

seeking to circumvent the discharge injunction). Injunctions have also been issued to stop civil proceedings by creditors seeking to enforce judgments against the trustee or the estate despite entry of a discharge of the debt in bankruptcy, or to block state court lawsuits attempting to enforce judgments against bankruptcy trustees personally that were rendered against the trustee only in a representative capacity. *See., e.g., In re Jacksen,* 105 B.R. 542 (9th Cir. BAP 1989).

### B. The Scope of Bankruptcy Judge's Authority to Issue Injunctions.

█ Section 105(a) speaks of the "court's" powers. Which judicial official is authorized to exercise those powers is addressed in § 105(c):

> The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation.

11 U.S.C. § 105(c). This section thus cannot be read as an independent grant of authority to a specific judicial officer; rather, the § 105 powers of bankruptcy judges are limited to those authorized under 28 U.S.C. §§ 157 and 1334. *See, Celotex Corp. v. Edwards,* — U.S. ——, ——, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995); *In re Johns–Manville Corp.,* 801 F.2d 60, 63 (2d Cir.1986).

█ The Bankruptcy Code's initial jurisdictional scheme was struck down in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Sections 157 and 1334 reflect the congressional compromise solution to the constitutional infirmities identified in *Marathon.* 28 U.S.C. § 157 and 1334. Section 157(b)(1) authorizes bankruptcy judges to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, ... and may enter appropriate orders and judgments" subject to appellate review.

Core proceedings are enumerated in § 157(b)(2), and include "matters concerning the administration of the estate." Bankruptcy judges may also hear, but not render final judgments in, matters "related to" cases under title 11. 28 U.S.C. § 157(c)(1). If all parties to a "related to" proceeding consent, then the bankruptcy judge can enter final judgments as if the matter were "core." 28 U.S.C. § 157(c)(2). In "related to" matters, the bankruptcy judge is supposed to submit proposed findings of fact and conclusions of law to the district court, which then enters the dispositive order.

At issue here is a "related to" proceeding. The Ex Parte Application was filed in the removed receivership proceeding. That proceeding predated the bankruptcy cases and was based exclusively on state law rights and remedies. Like the contract action in *Marathon,* the receivership action was independent of the bankruptcy proceeding. It is now pending in bankruptcy court only by removal. As set forth above, however, decisions in the adversary proceeding will undoubtedly impact the administration of the bankruptcy case. Therefore, this Court concludes that this matter is "related to" the Chapter 11 case, but does not arise in the Chapter 11 case, or under title 11. *See, American Hardwoods, Inc. v. Deutsche Credit Corp.,* 885 F.2d 621, 623 (9th Cir. 1989); *In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988); *but see, In re Jacksen, supra,* 105 B.R. at 543–44 (holding that a state court action to enforce a claim against a trustee was "a matter concerning the administration of the estate," and therefore "core"). Thus, absent consent of all parties, the bankruptcy court cannot enter a final judgment in this adversary proceeding.

Bankruptcy judges have generally been held to have the power to issue injunctions under § 105(a). *E.g., In re First Texas Petroleum, Inc., supra,* 52 B.R. at 324; *In re Seidelman, supra,* 57 B.R. at 153. However, the strong language and reasoning of the dissent in *Celotex Corp. v. Edwards,* — U.S. ——, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), may cause reexamination of this conventional assumption at least in "related to" matters.

Early in the *Celotex* Chapter 11 case, the bankruptcy court issued an injunction under

§ 105 to expand the protections of the automatic stay. The § 105 injunction had the effect of barring any "entity" from executing on supersedeas bonds posted by the debtor in cases pending on appeal, unless permission was obtained from the bankruptcy court. Notwithstanding the injunction, the district court in Texas permitted the Edwards to execute on their judgment bond. The Fifth Circuit affirmed. The United States Supreme Court reversed, on the ground that the injunction should have been challenged in the Florida bankruptcy court that issued it, not in the Texas district court. *Celotex, supra,* —— U.S. at ——, 115 S.Ct. at 1501. In so ruling, the Supreme Court stressed that it was *not* addressing "whether the Bankruptcy Court acted properly in issuing the Section 105 injunction." Rather, it was holding that the propriety of the order could not be collaterally attacked in another court. *Id.*

The dissent, however, would have held the injunction to be invalid on the ground that a non-Article III bankruptcy judge lacks jurisdiction ·to "determine" related proceedings under § 157(c)(1), stating:

> In sum, my view on the sufficiency of "related to" jurisdiction to sustain the injunction in this case can be stated quite simply: If a bankruptcy judge lacks jurisdiction to "determine" a question, the judge also lacks jurisdiction to issue an injunction that prevents an Article III court, which concededly does have jurisdiction, from determining that question.

*Id.* at ——, 115 S.Ct. at 1506 (Stevens and Ginsberg, dissenting).

The majority in *Celotex* did not adopt this reasoning, which is therefore not binding precedent. Although the dissent focused on the injunction's effect on an Article III court, the reasoning regarding the jurisdiction of bankruptcy judges would apply to the issuance of any injunctions in "related to" proceedings. Given the uncertainty on this jurisdictional question and the absence of precedent for injunctions directed specifically at state courts and their judges, as opposed to the parties, this Court concludes that any injunctive relief at this stage of the proceeding would require an order entered by the district court based upon the bankruptcy court's proposed findings of fact and conclusions of law.

### C. The Scope of Injunctive Relief

The cases about injunctions of state court proceedings have involved injunctions directed at the parties, not the courts. In our somewhat abbreviated search of relevant case law, not one case has been located in which the injunction was against the state court judge or the state court as an institution. All of them have in fact been directed at the parties, even though the rhetoric speaks in terms of "state court proceedings." In the usual case, if the parties are prohibited from pursuing or participating in any further proceedings, then the state court would not act on its own.

As the United States Supreme Court has emphasized,

> ... [T]he right to enjoin an individual, even though a state official, from commencing suits under circumstances already stated [where the state proceedings are based on an allegedly unconstitutional state statute], does not include the power to restrain a court from acting in any case brought before it, either of a civil or criminal nature, ....

*Ex Parte Young,* 209 U.S. 123, 163, 28 S.Ct. 441, 455, 52 L.Ed. 714 (1908) (enjoining a state attorney general and others from enforcing an unconstitutional state law purporting to set rates for railroads).

While nothing short of enjoining the state court would appear capable of completely stopping the proceedings here, how could a federal court enforce its injunction against a state court? In a sufficiently egregious civil contempt proceeding involving a private party, the United States Marshals can arrest the contemnor pursuant to a bench warrant, and incarcerate that individual until compliance is achieved. That enforcement remedy is simply not available here.

The answer must lie in the state court system. If affected parties believe that a state trial court is acting in excess of its jurisdiction, then an appropriate writ, appeal or other remedy must be pursued within the state court system; if necessary, all the way to the California Supreme Court. Federal review of such an issue is only by the United States Supreme Court after exhaustion of state appeals. The federal courts can only enjoin parties.

CONCLUSION

This Court concludes that the state court lacks jurisdiction to proceed any further in this matter. This Court now has exclusive jurisdiction over the removed action. Under basic principles of removal, the state court cannot take any further action. Moreover, an order has already been entered, based on preemptive federal law, absolving the trustees of the contempt alleged in the original motion. Any order by the state court on the contempt motion would necessarily either conflict with or duplicate the entered bankruptcy order. Under the circumstances, the repeated refusal of the state court judge to cease further proceedings interferes with this Court's jurisdiction, ignores federal supremacy and preemption in bankruptcy matters, and should stop. But the remedy for the problems faced by the parties here lies with the state court system's respect for the proper boundaries between the state courts and the bankruptcy system.

Under the circumstances, the receiver's Ex Parte Application is denied. A separate order shall be entered forthwith.