**In re BASIL STREET PARTNERS, LLC, Alleged Debtor.**

**No. 9:11–bk–19510–JPH.**

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

June 28, 2012.

See also 2012 WL 3962796.

Joshua B. Alper, Ft. Lauderdale, FL, Alan J. Perlman, Ft. Lauderdale, FL, Leyza F. Blanco, Miami, FL, for Debtor.

### ORDER GRANTING ALLEGED DEBTOR'S MOTION TO CONVERT AND DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

(Doc. 241, 285)

JEFFERY P. HOPKINS, Bankruptcy Judge.

#### I. *Introduction*

On October 19, 2011, four petitioning creditors filed an involuntary bankruptcy petition under chapter 7 of the Bankruptcy Code against the Alleged Debtor.[1] Prior to the commencement of this bankruptcy case, the Alleged Debtor had been battling the lead petitioning creditor, Antaramian Properties, LLC ("APL") in state court over APL's attempt to foreclose a contested mortgage lien encumbering the Alleged Debtor's property. The property in question comprises a portion of the overall development known as the Naples Bay Resort, which is an upscale resort complex featuring, in part, a luxury hotel. The development also includes privately owned condominium units and residences referred to generally as "The Cottages," an expansive clubhouse facility, a spa and fitness center, yacht and tennis clubs, a marina, restaurants, and a commercial shopping component known generally as "The Shoppes at Naples Bay Resort," among other amenities.[2]

---

1. The term "Alleged Debtor" is used to refer to a debtor in an involuntary case prior to the entry of an order for relief. In this case, prior to this Court's June 19, 2012 ruling granting the Alleged Debtor's motion to convert its case to chapter 11, no order for relief had been entered in the involuntary chapter 7 case. Upon conversion to chapter 11, however, the Court refers to the Alleged Debtor simply as the "Debtor."

2. Throughout the case, the parties have referred to the development as consisting of two main parcels: the "East Parcel" and the "West Parcel." On the West Parcel lies the hotel, which overlooks the marina. The commercial component, which consists of a number of retail stores known as The Shoppes at Naples Bay Resort, sits on the ground level of the hotel. The East Parcel houses the condominium units and clubhouse and its related amenities, including the pools, fitness center, and tennis courts.

In the course of the state court action, Gerard A. McHale, Jr. was appointed as a receiver of the Alleged Debtor's property (the "Receiver"). The Receiver's role prior to this bankruptcy case included operating the resort property on behalf of the Alleged Debtor and controlling its other assets, some of which are owned by other entities and do not constitute property of the estate.[3] According to the Receiver, when he was first appointed, there was simply a "pot" of cash that was not being properly accounted for or managed. Under the Receiver's watch, there is no longer a general "pot" of cash; instead, the resort's funds have been properly allocated among the various revenue-generating amenities (such as the hotel, marina, and club), and the Receiver now controls the receipt and disbursement of funds flowing through the resort.

The Receiver has been assisted in the day-to-day on-site management of the property by The Benchmark Management Company ("Benchmark"). Both the Receiver and Benchmark have continued their pre-petition roles and responsibilities after this case was filed, and, by all accounts, have done an exceptional job in performing their duties and stabilizing the ongoing business conditions at the resort.

As this bankruptcy case unfolded, numerous contested and critical issues arose which delayed the ultimate trial on whether an order for relief should be entered in the involuntary case. In due course, and after resolving those issues, the Court scheduled a final evidentiary hearing for June 19, 2012, on the issue of whether an order for relief should be entered under § 303 in the involuntary case. This date was the earliest practicable time, under all the circumstances, for this Court to determine the issues present in this heavily contested petition. *See* Fed. R. Bankr.P. 1013(a).

On May 31, 2012, merely eighteen days before the trial on the involuntary petition was scheduled to begin, the Alleged Debtor filed a motion to convert the pending involuntary chapter 7 case to a case under chapter 11 of the Bankruptcy Code (the "Motion to Convert") (Doc. 241). As with all matters in this case, APL—together with its manager, Jack Antaramian, in an individual capacity—objected to the Motion to Convert. (Doc. 248, 261). APL and Antaramian also filed an emergency motion to appoint a chapter 11 trustee in the event this Court converted the case to chapter 11. (Doc. 285, 293). To resolve the objection and adjudicate the Motion to Convert, the Court decided to postpone the trial on the order for relief, and instead use the time reserved on June 19, 2012 to conduct a final evidentiary hearing on the Motion to Convert (the "Hearing") (Doc. 262, 263).

## II. Matters Considered at the June 19 Hearing

In conjunction with its Motion to Convert, the Alleged Debtor also filed a Mo-

---

**3.** One of the disputes that arose in this case was the extent of the resort property that was actually owned by the Alleged Debtor. This issue arose in the context of the post-petition financing provided by Family Access Exchange, LLC, pursuant to § 364. The parties disagreed as to whether the Alleged Debtor or a different, non-debtor entity known as Knightsbridge Partners of Naples, LLC ("Knightsbridge") owned the commercial component of the property, and thus whether the Alleged Debtor could pledge the commer-

cial component as collateral for its loan from Family Access Exchange. The parties were able to fashion language acceptable to the lender that postponed the resolution of this issue to a later date. However, this issue remains unresolved, and the Receiver testified that this pending dispute has caused problems, as detailed later in this opinion, concerning the voting rights that can be exercised on behalf of the owner of the commercial component of the resort property.

tion to Excuse the Receiver's Compliance with 11 U.S.C. § 543 ("Motion to Excuse Turnover") (Doc. 270). By that motion, the Alleged Debtor sought to retain the Receiver in place, thus clarifying its position that it did not intend to displace the Receiver from his current operational responsibilities. Notwithstanding this apparent concession on the part of the Alleged Debtor, APL filed an Emergency Motion to Expand the Powers of the chapter 7 Trustee, or, alternatively, in the event conversion was ordered, to Appoint a chapter 11 Trustee (the "Chapter 11 Trustee Motion") (Doc. 285). In addition to ruling on the Motion to Convert and the various corresponding objections,[4] the Court also ruled on the Motion to Excuse Turnover and the Chapter 11 Trustee Motion.

### III. *The Preliminary Hearing on June 8*

That the Court ruled on these various motions at the Hearing should not have come as a surprise to any of the parties in interest. Prior to the Hearing, the Court conducted a preliminary telephonic hearing on June 8, 2012. Counsel for the Alleged Debtor and APL attended and participated in the hearing. During that hearing, the Court advised counsel for the Alleged Debtor and APL that it would be conducting a final evidentiary hearing on the Motion to Convert on June 18, 2012 (which was subsequently re-scheduled one day later to June 19). The Court also advised the Alleged Debtor and APL at that same June 8 hearing that the Hearing on June 19 would be conducted in lieu of the previously scheduled trial on whether an order for relief should be entered in the involuntary chapter 7 case. *See* Orders at Doc. 262, 263. Finally, the Court indicated at the June 8, 2012 hearing that one of the

issues which could be considered at the Hearing on the Motion to Convert was whether a chapter 11 trustee should be appointed in the event that the requested conversion was granted.

The issue of whether a chapter 11 trustee should be appointed upon conversion was expressly addressed by Judge Bernstein in *In re Euro–American Lodging Corp.*, 365 B.R. 421 (Bankr.S.D.N.Y.2007). In that case, the court converted an involuntary chapter 7 case to chapter 11 and appointed a chapter 11 trustee. This Court referenced and discussed *In re Euro–American* with counsel at length during the June 8, 2012 telephonic hearing. In fact, the Court's colloquy with counsel during that hearing included express commentary that the Court was considering appointing a chapter 11 trustee in connection with the Motion to Convert, just as the court had done in *In re Euro–American*. *See* Transcript from June 8, 2012 hearing (Doc. 273, p. 12, ll. 13–25; p. 13, ll. 1–8; p. 15, ll. 14–25; p. 16, ll. 1–8) (discussing *In re Euro–American* and expressing concern regarding whether the Debtor, as a debtor-in-possession if conversion were granted, would appropriately exercise its fiduciary duties, or whether a disinterested fiduciary should be appointed).

### IV. *Argument & Testimony from the June 19 Hearing*

At the Hearing, the Court heard extensive argument regarding both conversion and the propriety of appointing a chapter 11 trustee from counsel for APL and the Alleged Debtor. The Court also heard argument from proposed counsel for the debtor-in-possession (should conversion be granted) and the financial equity sponsor of the Debtor's proposed plan of reorganization,[5] Gulfwater NBR Investors, LLC

---

4. Doc. 248, 261, 278, 279.

5. The Alleged Debtor filed an unofficial proposed plan of reorganization as an exhibit to its Motion to Convert.

("Gulfwater"). Additionally, the Court heard argument from counsel for other parties-in-interest, including the Receiver, Benchmark, and several other creditors of the Alleged Debtor. Finally, the Court heard the testimony of Mr. McHale himself, in his capacity as Receiver.

The Receiver expressed his support for the requested conversion to chapter 11, and also testified that the case was one that "cries out" for the appointment of a chapter 11 trustee. To justify that statement, the Receiver further testified that the warring factions (namely, APL on one hand and the Alleged Debtor on the other hand) were disruptive to his management of and control over the Debtor's assets. It appears that representatives from both the Alleged Debtor and APL had provided conflicting reports and instructions to the Receiver's employees, thereby confusing them as to their duties and interfering with the Receiver's overall control of the property. The Receiver's sentiment that a chapter 11 trustee would be a welcome addition to this case was echoed by counsel for Benchmark and a number of other creditors.

During the course of the Hearing, in connection with the potential appointment of a chapter 11 trustee, an issue arose as to the interrelatedness of the Debtor and its proposed plan sponsor/financier, Gulfwater. The Court accepted the stipulation entered into between counsel for Gulfwater and APL as to the ownership interests of Gulfwater. In sum, Gulfwater is owned as follows: 1% by Basil Investors, LLC, which is, in turn, owned by three individuals, namely (i) Fred Pezeshkan; (ii) Iraj Zand; and (iii) Raymond Sehayek (collectively, "PZS"); and 99% by Gulfwater Investments, LLC, which, in turn, is ultimately owned in trust by family members of PZS. Pezeshkan, Zand, and Sehayek are the same individuals who ultimately own and control the Alleged Debtor. Thus, while Gulfwater is technically a distinct legal entity from the Alleged Debtor, the ultimate beneficial interest holders are essentially aligned with the Debtor. This fact gives the Court concerns about the potential—if not actual—conflicts of interests that could arise in this case that may prevent the Debtor, as a debtor-in-possession, from faithfully discharging its fiduciary duties to the estate.

## V.  *Issues Presented*

Among the legal issues raised in connection with the Hearing were: (i) whether conversion should be granted; (ii) if conversion were granted, whether an order for relief would be entered in the chapter 7 involuntary case prior to conversion; (iii) what role the Receiver and Benchmark would have with respect to the continued operations of the resort property and the Debtor's assets if the case were converted; and (iv) whether the Court should appoint a chapter 11 trustee if the case were converted. These issues are addressed below.

## VI.  *Legal Analysis*

### A.  *Conversion under § 706*

■  The Alleged Debtor filed its Motion to Convert pursuant to § 706(a) of the Bankruptcy Code. While the plain text and legislative history of that section appear to provide a debtor with an absolute right to convert a case, including an involuntary case, to one under another chapter, the United States Supreme Court has added a judicial gloss to a debtor's right of conversion based on the language contained in § 706(d). *See Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). Essentially, the Supreme Court held in *Marrama* that a debtor may not be eligible to be a debtor under the proposed chapter of conversion if "cause" exists to immediately dismiss the case or re-convert the case back to the chapter under which it was initially pend-

ing. While *Marrama* involved an attempted conversion from chapter 7 to chapter 13, numerous courts have extended its holding to the chapter 11 context as well. *See, e.g., In re Euro–American,* 365 B.R. at 425.

For purposes of denying a debtor's request to convert a case to chapter 11, "cause" can exist to deny such relief if the objecting party establishes by a preponderance of the evidence [6] that one of the factors expressly listed in § 1112(b)(4) is present, or if the debtor has engaged in "bad faith" conduct. *See Marrama,* 549 U.S. at 373, 127 S.Ct. at 1111. In this case, APL urged the Court to find both that (i) "cause" existed under a number of subsections of § 1112(b)(4), including § 1112(b)(4)(A), (B), (J), and (M); and (ii) the Debtor engaged in the type of bad faith conduct that would preclude conversion under *Marrama. See* APL's Objection (Doc. 248, pp. 12–13) and Surreply (Doc. 284, pp. 8–9). The Court, however, rejects these arguments. As discussed below, none of the objecting creditors established either (i) "cause" under any of the subsections of § 1112(b)(4); or (ii) that the Debtor engaged in the type of bad faith conduct present in *Marrama.*

### 1. *"Cause" under § 1112(b)(4) Factors*

APL argues that "cause" exists to deny the Alleged Debtor's Motion to Convert under § 1112(b)(4)(A). That section defines "cause" as "substantial or continuing loss to or diminution of the estate *and* the absence of a reasonable

likelihood of rehabilitation" (emphasis supplied). Both prongs of this subsection must be proven. *See, e.g., In re Khan,* 2012 WL 2043074 (9th Cir. BAP 2012); *In re Hermanos Torres Perez, Inc.,* 2011 WL 5854929, *2 (Bankr.D.P.R. Nov. 21, 2011). With respect to the second prong, in analyzing whether there is an absence of reasonable likelihood of rehabilitation, the focus is not on the technical issue of "whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re Khan,* 2012 WL 2043074, at *6.

In this case, APL's argument that there is no reasonable likelihood of rehabilitation misses the mark insofar as APL appears to be arguing that the Debtor could not comply with the confirmation requirements of § 1129. Here, Gulfwater's proposed $5 million equity infusion into the Debtor's business, including Gulfwater's initial $1 million good faith deposit (Doc. 267), coupled with the framework of a proposed plan, are sufficient to persuade the Court that the Debtor's business prospects warrant the continuance of its reorganization effort. The Court declines APL's invitation to turn the conversion hearing into a confirmation hearing, and concludes that APL has not met its burden of establishing "cause" under § 1112(b)(4)(A).

Likewise, APL's arguments for "cause" under § 1112(b)(4)(B) are also unavailing. The statute requires "gross

---

6. *See In re Eugene Alexander, Inc.,* 191 B.R. 920, 924 (Bankr.M.D.Fla.1994) (objecting creditor to a conversion motion must prove by preponderance of evidence that cause exists within the meaning of § 1112(b); "no debtor is required to establish entitlement to conversion by providing that cause does not exist"). *See also In re Broad Creek Edgewater, LP,* 371 B.R. 752, 757 (Bankr.D.S.C.2007) (debtor must first make prima facie case that case has not previously been converted and that it is eligible to be debtor in chapter under § 109; then burden shifts to objecting creditor to put on evidence establishing that debtor is not eligible for relief under *Marrama* ). It is undisputed that this case has not previously been converted and that the Alleged Debtor is eligible under § 109 to be a chapter 11 debtor.

mismanagement of the *estate*" (emphasis supplied). In this case, the Receiver has been in control of the estate and the Debtor's operations since this case commenced with the filing of the involuntary petition. Under § 541(a), the creation of the bankruptcy estate, including in involuntary cases under § 303, does not occur until the petition is filed. Therefore, the gross mismanagement factor does not relate back to pre-petition conduct. *See In re Keeley & Grabanski Land Partnership*, 460 B.R. 520, 540–41 (Bankr.D.N.D.2011) (finding that gross mismanagement must relate to post-petition conduct; also noting that chapter 11 trustee had been in charge of managing the debtor for the vast majority of the case); *In re Walton Street Properties, LLC*, 2011 WL 7179642, *3 (Bankr. W.D.Ark. July 1, 2011) (stating that § 1112(b)(4)(B) focuses on mismanagement of estate—not the debtor—and concluding that any prepetition conduct is irrelevant). Here, the Debtor has had no opportunity to manage (or mismanage) the estate. Accordingly, APL's reliance on § 1112(b)(4)(B) is misplaced.

Finally, the Court rejects APL's contention that § 1112(b)(4)(J) or (M) apply to this case. Subsection (J) relates to a debtor's failure to comply with the time periods prescribed by the Court for filing or confirming a plan. Similarly, subsection (M) relates to a debtor's inability to substantially consummate a *confirmed* plan. Here, at the time of the Hearing, no such time periods had even been established because the case had not yet been converted. Thus, APL's arguments under these subsections are premature.

## 2. *"Bad Faith" Conduct under Marrama and its Progeny*

■ With respect to the alleged bad faith conduct of the Debtor, in order to successfully oppose conversion, objecting creditors must demonstrate bad faith conduct that is "atypical" or "extraordinary."

*See Marrama*, 549 U.S. at 375, 127 S.Ct. at 1112, n. 11 (declining to articulate with precision what constitutes bad faith, but nevertheless noting that the conduct must be "atypical" and that its holding was limited to "extraordinary" cases). In *Marrama*, the debtor had fraudulently concealed significant assets from the chapter 7 trustee. The debtor made false statements and omissions in his schedules and financial affairs concerning the ownership, value, and pre-petition transfer of his principal asset. No such concern is present here in light of the Receiver's, concededly, very able stewardship of the Debtor's assets and operations.

However, in light of the vague parameters of what may constitute "bad faith," other courts have found bad faith to exist notwithstanding the absence of the type of fraudulent concealment present in *Marrama*. For example, in *In re Euro–American*, a single petitioning creditor filed an involuntary petition against the alleged debtor. In an effort to defeat the petition and have it dismissed on numerosity grounds under § 303(b), the debtor padded the number of creditors. *See In re Euro–American*, 365 B.R. at 425. The court noted that such conduct "arguably provides grounds for denying the conversion motion." *Id.* Nevertheless, the court granted conversion, despite the existence of the (arguable) bad faith conduct because chapter 11 provided the best means of preserving the debtor's value as an ongoing, viable business. *Id.* at 426. The court noted that the debtor's greatest value rested in its continued operations, which would cease under a liquidation proceeding in chapter 7. *Id.*

Other courts have likewise stated that conversion to chapter 11 is appropriate, notwithstanding the existence of bad faith conduct on the part of the debtor, where the debtor has a viable business which can

be maximized for the benefit of all creditors through the reorganization process afforded by chapter 11. *See In re Meunghee Joung,* 2011 WL 2413633, *5 (Bankr. D.N.M. June 10, 2011) ("in evaluating a request to dismiss or convert a Chapter 11 proceeding, the Court must also take into account what is in the best interest of creditors and the bankruptcy estate"); *In re 10 Bears at Chiloquin, Inc.,* 2007 WL 1673538 (Bankr.D.Or. June 6, 2007) (noting that if a plan can be confirmed to the ultimate benefit of creditors and the estate, then conversion should be granted).

In this case, APL has made much to do about the Alleged Debtor's conduct in defending against the involuntary petition. The Alleged Debtor has indeed opposed the involuntary petition at every turn, including by filing a motion to dismiss, which the Court ultimately denied. (Doc. 108). However, the Court is unwilling to find that exercising one's legal rights to controvert an involuntary petition is the standard by which bad faith should be measured. While the Alleged Debtor was ultimately unsuccessful in its effort to have the petition dismissed, it did not engage in the type of "extraordinary" conduct that would be necessary to deny conversion. Furthermore, even if the Court were to find that the Alleged Debtor had engaged in the requisite level of "bad faith" conduct that could warrant a denial of its Motion to Convert, there are a number of other creditors in addition to APL who would be much better served by the continued operation of the Alleged Debtor's property. Under the circumstances, chapter 11 provides the best pathway for potential recovery for unsecured creditors, especially given the fact that liquidation of the Alleged Debtor's assets under chapter 7 would benefit only the secured creditors whose expressed intention all along has been to credit bid for assets of the estate. *See* Transcript from January 18, 2012 hearing (Doc. 110, Part 5, p. 8, ll. 12–25; p. 9, ll. 1–25).

Accordingly, the Court finds that APL and Jack Antaramian, individually, have failed to carry their burden of demonstrating "cause" under *Marrama* and its progeny. As a result, the Motion to Convert is **GRANTED,** and the objection filed by APL (Doc. 248), and joined in by Jack Antaramian, individually (Doc. 261), is **OVERRULED.**

### B. *Continued Service of the Receiver and Benchmark*

Throughout the course of the proceedings on the Motion to Convert, the Debtor has conceded, including in its Motion to Excuse Turnover (Doc. 270), that in the event conversion is granted, the Debtor would not seek to displace or remove the Receiver or terminate the services of Benchmark.

Section 543(d) of the Bankruptcy Code authorizes the Court to keep a prepetition "custodian," which, by definition, includes the Receiver in this case, in place upon the filing of the bankruptcy petition. *See also In re Statepark Bldg. Group, Ltd.,* 2005 WL 2589179, *2 (Bankr. N.D.Tex. June 29, 2005); *In re 245 Associates, LLC,* 188 B.R. 743, 748–49 (Bankr. S.D.N.Y.1995) (noting the ability of a receiver to remain in possession of a debtor's assets while the bankruptcy case continues, including through exclusivity period); *In re Uno Broadcasting Corp.,* 167 B.R. 189, 200 (Bankr.D.Ariz.1994).

In accordance with § 543(d) and the foregoing case law, the Court hereby expressly orders that the Receiver and Benchmark shall remain in place until further order of this Court. This portion of the Court's Order is intended to prevent the occurrence of an event of default under the post-petition loan facility and related loan documents, such that the post-petition

lender, Family Access Exchange, will not be tempted to declare a default based on the Court's ruling granting the Motion to Convert. The Receiver (or the "Property Manager," as that term is defined in the post-petition loan agreement) shall continue to remain in control, possession, operation, and management of the "Project," as that term is defined in the post-petition loan agreement. Further, the Receiver (or "Property Manager") shall retain control over all disbursements of funds of and from the bankruptcy estate, until further Order of this Court.

Accordingly, the Motion to Excuse Turnover is **GRANTED.** The limited objections filed by Family Access Exchange (Doc. 278) and Benchmark (Doc. 279) are **OVERRULED as moot.**

### C. No Order for Relief Will be Entered in the Involuntary Chapter 7 Case

■ APL argues that an order for relief should be entered in the involuntary chapter 7 case prior to the case being converted. See Doc. 284, pp. 10–11. The Court rejects this argument. It is axiomatic that only a single order for relief is entered in any given bankruptcy case. In re Clinton, 166 B.R. 195, 199 (Bankr. N.D.Ga.1994). Furthermore, the express terms of the Bankruptcy Code dictate that where an involuntary petition has been controverted, an order for relief can only be entered in an involuntary chapter 7 case if, after trial, the elements of § 303(h) have been satisfied. See 11 U.S.C. § 303(h); see also In re Technical Fabricators, Inc., 65 B.R. 197, 199 (S.D.Ala. 1986) (stating that "[t]he issues under § 303(h)(1) must be litigated before the Bankruptcy Court can order relief in involuntary proceedings").

Because the Alleged Debtor's decision to convert its case to chapter 11 effectively mooted all pending issues related to the involuntary chapter 7 proceeding, the Court need not make the necessary determination under § 303(h)(1) on whether an order for relief should be entered in the chapter 7 case. This Order effectuates the conversion of the case to one under chapter 11, and constitutes an order for relief under § 348(a). All issues that were pending in the involuntary chapter 7 case pertaining to the merits under § 303(h)(1) are now moot. See In re Technical Fabricators, 65 B.R. at 199 (noting that a conversion constitutes an order for relief and "obviates the need for further litigation of the issues under § 303(h)(1)"); In re J.B. Lovell Corp., 876 F.2d 96, 99 (11th Cir. 1989) (stating that the involuntary chapter 7 debtor's election to convert the involuntary proceedings to a case under chapter 11 prevented the debtor from further pursuing chapter 7 issues on appeal, and holding that the pending appeal was moot).

### D. Appointment of Chapter 11 Trustee: § 1104

Having granted conversion, the Court was left with a decision at the Hearing as to whether to appoint a chapter 11 trustee, or whether to postpone that decision to a later date. Specifically, counsel for the Alleged Debtor articulated due process concerns, essentially arguing that § 1104(a), which governs the appointment of a chapter 11 trustee, requires "notice and a hearing" and that no such notice—or at least insufficient notice of the Court's intention to possibly appoint a chapter 11 trustee—had been provided. Debtor's counsel also objected to the appointment of a trustee on substantive grounds, arguing that upon conversion, "nothing would change." The Debtor acknowledged that the Receiver would remain in complete control of the Debtor's cash and other assets, and that Benchmark would remain in charge of the daily on-site operations of the resort property. Accordingly, Debtor contended, the status quo would be pre-

served, and there would be no reason or emergency to necessitate the appointment of a chapter 11 trustee. As discussed below, the Court finds that the facts of this case merit the appointment of a chapter 11 trustee, and that the Court's decision to appoint a trustee at the Hearing did not violate the Alleged Debtor's due process rights.

### 1. Due Process Concerns

Section 1104(a) does require notice and a hearing before a trustee can be appointed. However, under the rules of construction of the Bankruptcy Code contained in § 102, which apply to all sections of the Code, the phrase "after notice and a hearing" means "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). This definition informs of an underlying policy that certain bankruptcy cases, by necessity, must be handled expeditiously. It also provides flexibility in an atmosphere in which bankruptcy courts are often faced with urgent matters that require hearings to be scheduled on short notice. *In re Casco Bay Lines, Inc.*, 17 B.R. 946, 950 n. 3 (1st Cir. BAP 1982). This rule of construction is not inherently inconsistent with a party's due process rights, and courts have found that due process has been satisfied on relatively short notice. *See, e.g., In re Dr. R.C. Samanta Roy Institute of Science Technology, Inc.*, 2011 WL 2350095, *4 (3d Cir. June 15, 2011) (finding that six days' notice of the issues to be addressed through a show cause order satisfied due process in the context of a § 1112(b) dismissal proceeding). *Cf. Weaver v. School Bd. of Leon County*, 2006 WL 858510, *2 (11th Cir. Apr. 4, 2006) (holding that 10 days' notice between a request for injunctive relief and the court's order granting such relief was a sufficient time period to satisfy due process).

In fact, notice has even been held to be sufficient when such notice was provided for the first time during the course of an *ongoing* hearing. *See In re Bibo, Inc.*, 76 F.3d 256 (9th Cir.1996). The Ninth Circuit Court of Appeals in *Bibo*, affirmed the bankruptcy court's appointment of a chapter 11 trustee, even though the appointment was made by the court *sua sponte*, and the "notice" was provided during the course of the hearing. The debtor challenged the bankruptcy court's authority to appoint a chapter 11 trustee, but that decision was affirmed on appeal. *Id.* at 258. The debtor also argued on appeal that the bankruptcy court's appointment of a chapter 11 trustee on the day of the hearing, which was not even scheduled or noticed for that purpose, violated its due process rights. The Ninth Circuit rejected that argument, finding that the debtor received notice "because the judge stated what she was considering doing" [i.e., during the course of the hearing, as it unfolded]. The Ninth Circuit also held that the debtor received a hearing, noting that he was given an opportunity to cross examine the key witness, whose sworn declaration and corroborating testimony served as the basis for the appointment. *Id.* at 259.

In contrast to *In re Bibo*, the Court in this case placed the parties on notice—eleven days prior to the Hearing—of the possibility that a chapter 11 trustee could be appointed. Under the foregoing case law, that time period is not so short or inadequate as to constitute a violation of due process rights. Moreover, the Alleged Debtor was permitted to cross-examine the Receiver, the only witness called at the Hearing, whose uncontroverted testimony played a pivotal role in the Court's decision to appoint a trustee. The Court is satisfied that the Alleged Debtor knew of the potential to appoint a chapter 11 trustee and had a meaningful opportunity to be heard on that issue.

Furthermore, the Court certainly finds itself in the unique position of being a visiting judge whose term is soon to expire. Section 102 of the Bankruptcy Code allows the Court to account for this fact and lends additional support to the Court's decision to rule on the appointment of the trustee before its term ends. The Court has lived with this extremely contentious and rather complex case for eight months, during which time it has become intimately familiar with the facts of the case, the parties, and the issues presented here and those pending before the state court. As such, the Court believes that it is in the best position currently to ascertain whether a chapter 11 trustee should be appointed. However, if the Court were to postpone the adjudication of that issue—even briefly—the matter would fall to this Court's successor judge who, while certainly capable of determining the matter in her own right, is generally unfamiliar with the case. The Court was certainly sensitive to the due process concerns raised by the Alleged Debtor at the Hearing and, indeed, shared the same concerns itself. However, in light of the flexibility provided under § 102 regarding "notice and a hearing," coupled with the foregoing case law addressing the due process issue, the Court finds that the Alleged Debtor's due process rights were not violated when the Court appointed a chapter 11 trustee at the Hearing.

2. *Merits of the Appointment of the Chapter 11 Trustee*

■ In the context of an appointment of a chapter 11 trustee, a full evidentiary hearing is not required, as courts enjoy wide discretion under § 1104(a)(2) to appoint a trustee. *In re William A. Smith Constr. Co., Inc.,* 77 B.R. 124, 126 (Bankr. N.D.Ohio 1987). Nevertheless, an evidentiary hearing was conducted in this matter, at which the Court heard extensive argument from counsel and testimony from the Receiver. As noted previously, the Alleged Debtor was afforded an opportunity to cross-examine the Receiver.

■ The Court found the Receiver's testimony to be convincing. The Receiver has a wealth of experience in this field, having served as a receiver on over 150 occasions. The Receiver also has been involved in many bankruptcy cases over the course of his career. He is knowledgeable about the local business community and well-respected by its members. The Receiver has been in control of the particular resort property owned by the Alleged Debtor and the property's operations for nearly two years. The Court finds the Receiver's overall impressions about this case—and, specifically, the potential benefit that a chapter 11 trustee would bring to the case—to be extremely credible.

The Receiver testified that the warring factions in this case have been disruptive to his and his employees' efforts to operate the property. The Receiver also described a recent sequence of events in which his authority to vote on behalf of a block of 300 voting interests/owners at the resort, including the commercial component of the property (the ownership of which remains in dispute), has been challenged by a lawyer from the Alleged Debtor's counsel's current law firm (i.e., a colleague of the Alleged Debtor's current bankruptcy counsel). This challenge concerns the Court, because it suggests that if the Alleged Debtor were allowed to operate as a debtor-in-possession, it may simply forgo voting on behalf of the commercial component in a manner beneficial to the estate, as the Receiver has attempted to do. The fact that a lawyer from the Alleged Debtor's own law firm has challenged the Receiver's voting authority implicates conflicts of interest between the Debtor's own agenda and its fiduciary duties to the estate as a debtor-in-possession.

In his testimony, the Receiver also referenced a dispute over the ownership of proceeds generated by the on-site laundry facilities, as well as a dispute over club dues. According to the Receiver, a non-debtor entity known as Knightsbridge, which happens to be owned by PZS (i.e., the same individuals who would be in control of the would-be debtor-in-possession), has asserted a right in and to the laundry fees and club dues, whereas the Debtor (under the current control of the Receiver) stakes a competing claim to those same fees and dues. If the Debtor were permitted to proceed in its chapter 11 case as a debtor-in-possession, with all management decisions being made by PZS, questions and concerns would abound regarding what would happen with the dispute over the laundry fees and club dues. As the case now stands, the Receiver has been acting to protect the interest of the estate. However, if the Debtor proceeds as a debtor-in-possession, the same ultimate ownership group would be present on both sides of the dispute. Both the Receiver and other creditors present at the Hearing expressed concern—if not doubt—as to whether the Debtor, as a debtor-in-possession, would faithfully discharge its fiduciary duties on behalf of the estate where the potential conflicts of interest, as described above, were manifest.

Finally, the Court notes that the proposed plan sponsor, Gulfwater, is also owned both directly and indirectly by PZS and their family members. While Gulfwater has characterized its projected $5 million loan as a capital/equity infusion (as opposed to a loan/new indebtedness), the similarity in the ownership structure between the Debtor and Gulfwater gives the Court pause for concern. Gulfwater may be a perfectly acceptable investor or lender for infusing badly needed capital into the Debtor's operations to help facilitate its reorganization effort. The Court's concerns are not so much focused on the motivations of Gulfwater for sponsoring a plan, but rather on the decision of whether to enter into an agreement with Gulfwater, in the first instance, is in the best interest of creditors and the estate. The Court believes that this decision is best left to a disinterested trustee performing the duties enumerated under § 1106(a), instead of a debtor-in-possession that is controlled by one of two warring factions seeking to oust the other from maintaining ownership and/or control of the resort.

Underlying the Court's concern is its observation that both factions have exhibited a willingness throughout this case to spend seemingly limitless sums on attorneys' fees in order to prolong their litigation in the hope of gaining the upper hand for ownership or control of the Debtor. A chapter 11 trustee comes with none of the attendant biases of the warring factions. A trustee can investigate Gulfwater's sponsored plan and offer of capital/equity infusion, independent of the existence of any interests that might be considered adverse to the estate. And, if necessary, a trustee could solicit and evaluate other plans, formulate her own plan, decide whether it is desirable to continue the business operations altogether (or, alternatively, liquidate assets), recommend conversion of the case back to chapter 7, and otherwise manage the affairs of the Debtor, including deciding whether to object to claims or to pursue causes of actions available to the estate. In other words, the Court is not convinced, based on the totality of circumstances presented, that these important fiduciary duties will be performed as expected without the intervention of a disinterested trustee.

Under § 1104(a)(2), the Court is required to appoint a trustee if such appointment is in the best interest of creditors, any equity security holders, and other interests of the estate. In making its deter-

mination under this standard, the Court has weighed the pros and cons of appointing a trustee. With a chapter 11 trustee comes an additional layer of cost and expense to the estate. To this point, however, this estate has evinced its ability to absorb these costs without financial hardship, as evidenced by the appointment and funding of a chapter 7 trustee and her counsel on separate occasions (Doc. 19, 39, 130). At the Hearing, the Debtor also complained that the appointment of a chapter 11 terminates, as a matter of law, the Debtor's exclusivity rights under § 1121(c)(1). Those considerations, however, are ultimately outweighed by the benefits that a chapter 11 trustee bestows on creditors and the estate in this case.

In addition to the concerns expressed above, the Receiver implored the Court at the Hearing to appoint a trustee, noting that the case "cries out" for one. The property manager and creditors who attended the Hearing were likewise unanimous in their support for a trustee. In light of (i) the lack of confidence in the Debtor expressed at the Hearing by both the creditor body and the neutral Receiver, and (ii) the potential for conflicts of interest to arise and for fiduciary duties to be ignored, the Court finds that the appointment of a disinterested chapter 11 trustee whose allegiance to the estate is unassailable would best serve the interests of creditors and the estate.

Furthermore, the Court agrees with Judge Bernstein's analysis in *In re Euro–American* that the termination of exclusivity may actually be a positive development insofar as other parties are permitted to file a competing plan, thereby fostering an atmosphere of competition that may prove beneficial to all parties involved. *In re Euro–American,* 365 B.R. at 432. A competitive playing field may spur the parties to a negotiated, rather than a litigated, resolution of this case. Such a result would certainly be a welcome sight to creditors and other interested parties, as the disputes between the warring factions (PZS and APL) long predate the bankruptcy filing by several years.

That the parties have been embroiled in these hotly contested, heavily litigated and expensive disputes for years on end—exhausting the limited resources of both the state and federal court systems—brings the Court to its final point. In *In re United States Mineral Products Co.,* 105 Fed.Appx. 428 (3d Cir.2004), the court affirmed the bankruptcy court's appointment of a chapter 11 trustee based on the "length of time the proceedings had been pending, the size of the case, the contentious and acrimonious nature of the relationships among the parties, the lack of trust, the lack of progress, and the need for a neutral party to 'maximize value and construct a plan ... acceptable to creditors.' " *Id.* at 430. *See also In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 473 (3d Cir.1998) (upholding a chapter 11 trustee's appointment where there was "deep-seeded conflict and animosity" between the parties). The Court remarked at the Hearing that this case was the most contentious case it had presided over in fifteen years on the bench. To the extent that the degree of contentiousness in a particular case lends further support to appoint a trustee, as suggested by the foregoing cases, this case certainly passes the test with flying colors.

### VII. *Conclusion*

For the reasons stated above, as well as the reasons stated orally on the record at the Hearing, which constitutes the findings of facts and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, and the decision of the Court on any issue not addressed in this Order, it is hereby

ORDERED that the Debtor's Motion to Convert (Doc. 241) is **GRANTED.**

It is further **ORDERED** that APL's Chapter 11 Trustee Motion (Doc. 285) is **GRANTED** in that a chapter 11 trustee will be appointed. The United States Trustee is forthwith directed to appoint a chapter 11 trustee in this case.

It is further **ORDERED** that the Debtor's Motion to Excuse Turnover (Doc. 270) is **GRANTED.** The Receiver (or the "Property Manager," as that term is defined in the post-petition loan agreement) shall continue to remain in control, possession, operation, and management of the "Project," as that term is defined in the post-petition loan agreement. Further, the Receiver or "Property Manager" shall retain control over all disbursements of funds of and from the bankruptcy estate, until further Order of this Court.

It is further **ORDERED** that the objections filed at Doc. 248 and Doc. 261 in opposition to the Motion to Convert are **OVERRULED,** and the limited objections filed at Doc. 278 and Doc. 279 are **OVERRULED as moot.**

**DONE AND ORDERED.**